**Sandra S. SPIRES, Plaintiff,**

v.

**SUNFLOWER ELECTRIC COOPERATIVE, INC., Defendant.**

**Sandra S. Spires, Plaintiff,**

v.

**Sunflower Electric Power Corporation, f/k/a/ Sunflower Electric Cooperative, Inc., and National Rural Electric Cooperative Association, Defendants.**

**Civil Action Nos. 87–4208–MLB, 01–1202–MLB.**

United States District Court, D. Kansas.

Sept. 10, 2003.

Kenneth G. Gale, Adams & Jones, Chartered, Wichita, KS, for Plaintiff.

L. Earl Watkins, Jr., Mark A. Rondeau, Watkins, Calcara, Rondeau, Friedeman, Bleeker, Glendenning & McVay, Chtd., Great Bend, KS, Darrell L. Warta, Mark A. Biberstein, Foulston Siefkin LLP–Wichita, Wichita, KS, John J Range, Peter J. Loughlin, Hunton & Williams, Washington, DC, for Defendants.

## *MEMORANDUM AND ORDER*

BELOT, District Judge.

### I. INTRODUCTION

Sandra S. Spires filed suit against Sunflower Electric Holdings, Inc., her former employer, and National Rural Electric Cooperative Association (NRECA), alleging that they "have not substantially complied with [a settlement] agreement to continue plaintiff's coverage under Sunflower's group employee medical plan" (Doc. 1 ¶ 10). This case is currently before the court upon motions for summary judgment filed by Spires, the Sunflower Electric Power Corporation and the National Rural Electric Cooperative Association (Docs.47, 50, 94). For the reasons stated, the motion filed by defendant NRECA is GRANTED, the motion filed by defendant Sunflower is GRANTED in part and DENIED in part and the motion filed by Spires is GRANTED in part and DENIED in part.

## II. FACTS

Sunflower Electric Power Corporation, a Kansas cooperative, hired Spires on January 16, 1984, as a lab technician. Sunflower is a member of NRECA, a not-for-profit cooperative association which sponsors pension and welfare benefit plans for member systems. Cooperative Benefit Administrators, Inc. (CBA) is a wholly-owned subsidiary of NRECA and adjudicates claims made pursuant to NRECA's welfare benefit plans under the Employee Retirement Income Security Act.

In 1984, Sunflower participated in various plans sponsored by NRECA, including the pension plan, the medical plan, the long-term disability plan and the group life insurance plan. On June 30, 1985, Sunflower withdrew from participation in the NRECA medical plan and group life insurance plan and sponsored a group employee medical plan titled the Sunflower Self-Insured Medical Plan to take effect the following day. On November 7, 1985, Sunflower terminated Spires' employment. On August 1, 1987, CBA became the third party administrator for Sunflower's insurance plan and was responsible for processing and adjudicating claims based on eligibility and enrollment information provided by Sunflower.

In 1987, Spires filed a lawsuit alleging employment discrimination in the conditions of her employment and discriminatory termination. On December 12, 1988, Spires and Sunflower entered into a settlement agreement. The agreement, embodied in a Journal Entry of Consent Judgment, stated that

> [d]efendant will immediately reinstate the plaintiff as a participant in defendant's group employee medical plan and will pay all premiums and future claims due under the terms of the plan. Such coverage will continue while plaintiff is on long-term disability or until such time as plaintiff is employed and covered under another employer's group medical plan.

Pursuant to that agreement, Sunflower reinstated Spires in the Sunflower Self-Insured Medical Plan. In addition to her reinstatement, Spires was at that time also on the NRECA long-term disability plan. Since the date of the 1998 settlement agreement and consent judgment, Spires has not again been employed or covered by another employer's group medical plan and remains on long-term disability through the NRECA plan.

On April 17, 1989, Anthony C. Williams, Director of the Retirement, Security and Insurance Department of NRECA, wrote a letter to L. Christian Hauck of Sunflower and stated in reference to the settlement agreement that NRECA was "agreeable to picking up 100 percent of Mrs. Spires' future medical expenses as provided under the settlement Sunflower reached with her. We will also have Mrs. Spires reinstated in group term life insurance as a disabled former employee."

On November 20, 1989, Spires, Sunflower, CBA, NRECA and the NRECA Group Benefits Trust settled a second lawsuit. The parties dispute whether the 1989 settlement agreement modified the 1998 settlement agreement and consent judgment. From January 1989 to March 31, 1993, Spires' group health coverage was provided pursuant to the Sunflower Self-Insured Medical Plan. The plan remained Spires' primary medical plan after she qualified for Medicare in May 1990. On March 31, Sunflower terminated the Sunflower Self-Insured Medical Plan and adopted on the following day the NRECA Medical Plan as its group employee medical benefit plan.

Prior to August 10, 1993, federal law required that Medicare be the primary insurance provider for those no longer actively working at age 65. If working, a private medical plan would remain primary

until the employee reached age 69. The Revenue Reconciliation Act of 1993 allowed private medical plans to treat Medicare as the primary payer for disabled plan participants who were not actively working, regardless of age. The private medical plan was to remain primary to Medicare if the disabled employee was working. NRECA could therefore apply to disabled employees, eligible for Medicare and not actively working, the "carve-out" provision of its medical plan that made Medicare the primary payer. Using a computer program it developed, CBA identified participants in the NRECA medical plan that were affected by the new law. For some unknown reason, the computer program did not identify Spires as being a member of this group. The participants were directed to forward their Medicare cards to CBA and to sign up for Medicare Part B.

On February 25, 1999, CBA informed Spires that Medicare should be the primary provider of her medical coverage pursuant to the carve-out provision of the NRECA medical plan and the Revenue Reconciliation Act. On May 19, 1999, CBA informed Spires that it would start to estimate Medicare's payment as of July 1, 1999, unless she provided it with her Medicaid card. In November 1999, CBA had not received Spires' Medicaid card as requested. It thus informed Spires that it would treat Medicare as the primary payer on all of her subsequent claims by estimating the amount that Medicare would pay and then deducting the estimates from its payments. For each claim submitted by Spires after July 1, 1999, CBA sent Spires an Explanation of Medical Benefits form detailing the amount of benefits set off from the payments made by CBA because Medicare was deemed the primary payer. Each form notified Spires of her right to appeal the CBA determination.

Medicare was adjudged by the Health Care Financing Administration of the U.S. Department of Health and Human Services to be the primary payer of Spires' covered medical expenses incurred on or after July 1, 1999. The Department allowed Spires to re-enroll in Medicare Part B retroactively to July 1, 1999, without incurring a penalty for late enrollment, but Spires instead elected to re-enroll retroactively only to February 1, 2000.

In February 2000, Sunflower transferred all of the NRECA Medical Plan participants, except for Spires, to a plan with Blue Cross and Blue Shield of Kansas. The Blue Cross and Blue Shield plan treats Medicare as the primary payer of medical expenses for non-active employees eligible for Medicare. Spires remained covered as the sole participant in a Sunflower subgroup of the NRECA Medical Plan.

## III. SUMMARY JUDGMENT STANDARD

The usual and primary purpose of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if sufficient evidence exists "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998); *see also Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir.2000). The mere existence of some factual dispute will not defeat an otherwise properly supported

motion for summary judgment because the factual dispute must be material. *See Renfro v. City of Emporia,* 948 F.2d 1529, 1533 (10th Cir.1991).

## A. Moving Party's Burden

The moving party must initially show both an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See Adler,* 144 F.3d at 670. The nature of the showing depends upon whether the movant bears the burden of proof at trial with respect to the particular claim or defense at issue in the motion. If the nonmoving party bears the burden of proof, the movant need not "support [its] motion with affidavits or other similar materials *negating* the opponent's" claims or defenses. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (emphasis in original). Rather, the movant can satisfy its obligation simply by noting the absence of evidence on an essential element of the nonmovant's claim. *Adler,* 144 F.3d at 671.

On the other hand, if the movant has the burden of proof on a claim or defense raised in a summary judgment motion, it must show that the undisputed facts establish every element of the claim entitling it to judgment as a matter of law. *See, e.g., United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc); *United Mo. Bank of Kansas City v. Gagel,* 815 F.Supp. 387, 391 (D.Kan.1993). Moreover, the moving party must show the absence of genuine issues of fact regarding each of the affirmative defenses specifically reserved by the non-moving party. *See Gagel,* 815 F.Supp. at 391. "The party moving for summary judgment must establish its entitlement beyond a reasonable doubt." *Id.*

## B. Non–Moving Party's Burden

If the moving party properly supports its motion, the burden then shifts to the nonmoving party who may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. *See Mitchell v. City of Moore,* 218 F.3d 1190, 1197–98 (10th Cir.2000). In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler,* 144 F.3d at 671. A party opposing summary judgment also "cannot rely on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988). If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted. *See Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 533 (10th Cir.1994).

## C. Summary

When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If there is sufficient evidence on which a trier of fact could reasonably find for the nonmoving party, then summary judgment cannot be granted."[1] *Prenalta*

---

1. Even though the parties have filed cross-motions for summary judgment, the legal standard does not change. *See United Wats, Inc. v. Cincinnati Ins. Co.,* 971 F.Supp. 1375, 1382 (D.Kan.1997). It remains this court's sole objective to discern whether there are any disputes of material fact. *See Harrison*

*Corp. v. Colo. Interstate Gas Co.*, 944 F.2d 677, 684 (10th Cir.1991).

## IV. ANALYSIS

Though Spires pursues several avenues for relief, she essentially claims that "defendants have violated the [consent judgment] by failing to provide the plaintiff coverage under the Sunflower employee medical plan, and by providing the plaintiff plan coverage which treats Medicare, rather than the plan, as the plaintiff's primary insurer" (Doc. 95 1–2). Defendants dispute that the consent judgment requires Sunflower to provide medical coverage that treats Spires as an active rather than a disabled employee, thus making the medical plan itself the primary payer over Medicare. They further respond that Spires is correctly covered by a Sunflower subgroup of the NRECA plan, pursuant to the terms of the consent judgment (Doc. 48 at 19–21; Doc. 51 at 10–14). The parties agree that the case presents only questions of law and is thus ripe for a dispositive ruling from the court.

### A. ERISA

Spires contends that "defendants have violated ERISA by failing to provide the plaintiff the benefits promised in the plaintiff's employee benefit plan; to wit the Consent Judgment and the April 17, 1989, letter agreement" (Doc. 93 at 42). As Spires readily admits, however, her claim

presupposes that the "Consent Judgment, or the Consent Judgment and the April 17, 1989, letter, constitute an employee welfare benefit plan under Section 3(1) of ERISA, 29 U.S.C. § 1002(1) and Section 402(b) of ERISA, 29 U.S.C. § 1102" (Doc. 93 at 61).[2]

■ An employee welfare benefit plan is defined as

> any plan, fund, or program which ... is ... established or maintained by an employer ... to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise ... medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment ....

29 U.S.C. § 1002(1). A "plan, fund, or program" falls within ERISA's ambit if a reasonable person can ascertain, from the surrounding circumstances, the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits. *See Gaylor v. John Hancock Mut. Life Ins. Co.*, 112 F.3d 460, 464 (10th Cir.1997) (relying upon *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir.1982) for what has become known as the *Donovan* test); *Siemon v. AT & T Corp.*, 117 F.3d 1173, 1174 (10th Cir.1997) (relying upon the *Donovan* prong in holding that the program was not covered by ERISA because

---

*W. Corp. v. Gulf Oil Co.*, 662 F.2d 690, 692 (10th Cir.1981). The court is, however, justified in assuming that evidence need not be considered apart from what has been filed. *See James Barlow Family Ltd. P'ship v. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997). Additionally, the Tenth Circuit has made it clear that each motion is to be treated separately-the denial of one does not require the granting of the other. *See Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir.2000) (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir.1979)).

**2.** The determination of whether the consent judgment, by itself or in conjunction with the April 17, 1989 letter, is an employee welfare benefit plan and thus governed by ERISA is a mixed question of law and fact. *See Mandeville v. Quinstar Corp.*, 2000 WL 1375264, at *10 (D.Kan. Aug.29, 2000). Where the "mixed question essentially involves conclusions drawn from undisputed facts," as it does here, the issue instead involves "primarily a legal question" to be decided solely by the court. *Peckham v. Gem State Mut. of Utah*, 964 F.2d 1043, 1047 n. 5 (10th Cir.1992).

"the potential benefits are too ephemeral and contingent ... to ascertain what, if anything, AT & T intends an employee to receive").

Furthermore, the Supreme Court has held that a plan must implicate benefits that require an ongoing administrative program to meet the employer's obligation. *See Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 11, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987); *Herring v. Oak Park Bank,* 963 F.Supp. 1558, 1564–68 (D.Kan.1997) (finding no ongoing administrative scheme because the program did not require the defendant to exercise discretion, was only for the benefit of the plaintiff, and only required simple, mechanical calculations). Accordingly, to be considered a "plan," the agreement must satisfy both the *Donovan* and *Fort Halifax* tests. The court determines that it does not.

██ The consent judgment does nothing more than "reinstate the plaintiff as a participant in defendant's [existing] group employee medical plan." While it does specify that Sunflower will pay all premiums and future claims due under Sunflower's employee medical plan and it notes the conditions precedent to the termination of that funding, the consent judgment does not by itself explain, with any detail, the

intended benefits and procedures for receiving those benefits, nor does it require, at least directly, an ongoing administrative program apart from that required by the group employee medical plan itself. Stated plainly, the consent judgment lacks any indication that Sunflower intended to create a new plan for Spires, and instead unambiguously provides for Spire's reinstatement into an existing medical plan. *See Deboard v. Sunshine Mining and Refining Co.,* 208 F.3d 1228, 1238 (10th Cir. 2000) (holding that the employer intended to create a new employee welfare benefit plan).

"Some essentials of a plan, fund, or program can be adopted, explicitly or implicitly, from sources outside the plan, fund or program," but the consent judgment incorporates the entirety of Sunflower's group employee medical plan and adds little to that plan beyond specifying the source and duration of the necessary funding. *Donovan,* 688 F.2d at 1373. It is that medical plan, Sunflower's group employee medical plan, which falls within the bounds of ERISA, not the consent judgment directing Spires' reinstatement into the aforementioned plan.[3] Defendants' motions with respect to Spires' ERISA claim are thus granted.[4]

---

3. The court further notes that even if the April 17 letter replaces Sunflower with NRECA as the primary provider of funding for Spire's coverage under Sunflower's group employee medical plan, it does nothing to change the court's conclusion that the settlement agreement does not constitute a plan pursuant to ERISA. It merely replaces the identity of the funding provider.

4. Due to the court's ruling, Spires' claims brought pursuant to various breach of contract theories are not otherwise preempted by ERISA. *See Lettes v. Kinam Gold Inc.,* 3 Fed. Appx. 783, 786 (10th Cir.2001) (" '[C]ommon law ... breach of contract claims are preempted by ERISA if the factual basis of the cause of action involves an employee benefit

plan.' ") (quoting *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1121 (10th Cir.1995)).

The court also notes that its ruling renders moot NRECA's assertion that it is not the proper party defendant in an action concerning ERISA benefits. "Under ERISA, a plaintiff must bring his claim against the plan administrator." *Bowers v. Multimedia Cablevision, Inc.,* 1998 WL 856074, at *6 (D.Kan. Nov.3, 1998). NRECA claims that it "is not and never was an ERISA fiduciary with respect to the adjudication, denial, or payment of benefit claims under (i) the Sunflower Self–Insured Medical Plan; (ii) any ERISA plan allegedly created by the Consent Judgment ...; or (iii) the NRECA Medical Plan from which Ms. Spires benefits were paid at the time this dispute arose" (Doc. 48 at 22). Because the consent judgment is not

## B. The April 17 Letter

On April 17, 1989, Anthony C. Williams, Director of the Retirement, Security and Insurance Department of NRECA, wrote a letter to L. Christian Hauck of Sunflower as part of an agreement between NRECA and Sunflower, stating that NRECA was "agreeable to picking up 100 percent of Mrs. Spires' future medical expenses as provided under the settlement Sunflower reached with her." Spires claims that "[t]he promise made by NRECA to Sunflower in the April 1989 letter agreement is a third-party beneficiary contract" and that as a third-party beneficiary, she is entitled to sue to enforce the provisions of the agreement (Doc. 95 at 21).

▉ "Generally, where a person makes a promise to another for the benefit of a third person, that third person may maintain an action to enforce the contract even though he had no knowledge of the contract when it was made and paid no part of the consideration." *Martin v. Edwards*, 219 Kan. 466, 472, 548 P.2d 779 (1976). But to be a third-party beneficiary to a contract under Kansas law, "the contract must be made for the third-party's benefit." *United States v. United States Auto. Ass'n*, 968 F.2d 1000, 1001 (10th Cir.1992); *see also Fasse v. Lower Heating & Air Conditioning, Inc.*, 241 Kan. 387, 389, 736 P.2d 930 (1987) ("To be a third party beneficiary to a contract, the contract must be made for the third party's benefit as its object, and he must be the party intended to be benefited in order to be entitled to sue upon it."). A contract that confers mere incidental benefits upon a third party does not create within the incidental beneficiary the power to enforce the agreement. *See Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1119 (10th Cir.2001) ("An incidental beneficiary is a person who will be benefitted by performance of a promise but who is neither a promisee nor an intended beneficiary.").

The terms of the April 17 letter are clear and unambiguous. *See Wolfgang v. Mid–America Motorsports, Inc.*, 111 F.3d 1515, 1524 (10th Cir.1997) ("The intention of the parties and the meaning of the contract are to be determined from the instrument itself where the terms are plain and unambiguous."). In the letter, NRECA expressly identified Spires and agreed to "pick[ ] up 100 percent of Mrs. Spires' future medical expenses," thus intentionally conveying a direct benefit upon her.[5]

a "plan, fund, or program" under ERISA, Spires' ERISA claim fails and the court expresses no opinion on whether NRECA was appropriately named as a defendant under ERISA.

Likewise, the court's ruling also renders unnecessary any consideration of defendants' argument that Spires' ERISA claim is barred for failure to exhaust all of the administrative remedies available to her. *See Held v. Mfrs. Hanover Leasing Corp.*, 912 F.2d 1197, 1206 (10th Cir.1990) (holding that "exhaustion of administrative (i.e., company- or plan-provided) remedies is an implicit prerequisite to seeking judicial relief" pursuant to ERISA).

5. The fact that Spires did not rely on the agreement to her detriment is of no import. According to one commentator,

[i]n order for a third person to recover on a contract made and intended for his benefit, it is not essential that he knew of the contract at the time it was made. The fact that he did not act upon the faith of, or in reliance upon, the contract does not defeat his right of recovery.

17A Am Jur.2d *Contracts* § 455 (1991). NRECA cannot point to any authority that clearly controverts this rule. Though it relies on *Indy Lube Investments, L.L.C. v. Wal–Mart Stores*, 199 F.Supp.2d 1114 (D.Kan.2002), and *Noller v. Gen. Motors Corp.*, 244 Kan. 612, 772 P.2d 271 (1989), for support of its proposition that detrimental reliance is a necessary prerequisite to a suit by a third-party beneficiary, those cases clearly hinge the third party's power to sue on the intent of the primary parties to benefit the third party. *See Indy Lube*, 199 F.Supp.2d at 1126–27 (noting that a third party may sue to enforce a contract if he was an intended beneficiary to the contract); *Noller*, 244 Kan. at 618, 772 P.2d

■ The court cannot rule, however, based on the evidence presented, that NRECA has a contractual obligation to Spires. Although NRECA certainly intended to confer a benefit to Spires pursuant to the terms of its April 17 letter, "there must also be consideration for the contract." *Hampton,* 247 F.3d at 1119. Spires was not a third-party beneficiary to a contract between Sunflower and NRECA unless there was a valid contract. The parties have presented very little evidence to the court regarding the dispute and subsequent agreement between Sunflower, NRECA and CBA, and the court cannot venture a guess as to whether a binding agreement did in fact exist. The evidence only supports a promise on the part of NRECA to "pick[ ] up 100 percent of Mrs. Spires' future medical expenses" rather than a binding contract to do the same. Because Spires fails to create a genuine issue of fact as to whether she was a third-party beneficiary to a contract, the court grants NRECA's motion on that issue.[6]

### C. Release of Liability

Sunflower argues that a settlement agreement, entered into in November 1989 between the parties in settlement of a suit filed subsequent to the suit at issue in the consent judgment, "included a comprehensive release which absolved Sunflower from any further obligations and released it from all claims, including those arising under the Consent Judgment" (Doc. 51 at 14). Sunflower's argument focuses primarily on two segments of the later settlement agreement, quoted as follows:

It is the intent of the parties that SPIRES be treated the same as other similarly situated individuals participating in the NRECA group term life, major medical, pension and long-term disability plans. Her coverage under those plans, and the rights and obligations of the parties, shall be determined by CBA's customary procedures and the terms and provisions of those plans.

... SPIRES ... does hereby release ... SUNFLOWER, NRECA, the TRUST, and CBA ... of and from all manner of the following:

(1) Any and all claims, demands, damages, debts, losses, actions, causes of action, suits at law or in equity and liability of every kind and nature whatsoever ... for, on account of, growing out of, arising from, or in any way incidental to or related to any claim related to her employment or discharge by SUNFLOWER, and any claim for employee benefits, including long-term disability benefits, group term life insurance coverage, pension benefits, and major medical coverage, regardless of whether such claim has been submitted to or considered by SUNFLOWER, NRECA, the TRUST or CBA, both as to all matters and things now known, and also as to all matters and things which may hereafter be discovered, if such there be.

(Doc. 95 exh. 8 at 4–5). The agreement further states, however, that

this Release covers all claims asserted, or which might have been asserted or litigated by SPIRES against SUNFLOWER, NRECA, the TRUST or CBA, their subsidiaries, affiliates and members, including all claims excluded from the scope of the Settlement Agree-

271 ("Noller was not an intended beneficiary to the contract between Beard and GMC and is thus not entitled to sue for contractual benefits").

**6.** The court notes that its ruling renders moot NRECA's assertion that Spires failed to set forth in her complaint a third-party beneficiary claim based on a breach of contract theory. The court thus expresses no opinion on that issue.

ment in *Sandra S. Spires v. Sunflower Electric Cooperative, Inc.*, Case No. 87–4208, as it is the intent of SPIRES to extinguish fully every and all claims against SUNFLOWER, NRECA, the TRUST and CBA arising out of or in any way related to claims SPIRES may have against SUNFLOWER, NRECA, the TRUST and CBA, including claims referenced in the causes of action described herein

(Doc. 95 exh. 8 at 6).

■ The settlement agreement does not release defendants from liability for failure to comply with the consent judgment. To the contrary, the agreement specifically excludes claims arising out of the earlier settlement between the parties. The agreement also does not allow defendants to treat Spires differently than other similarly situated individuals participating in Sunflower's medical plan. The court thus determines, as an initial matter, that resolution of the present case depends solely on the court's interpretation of the consent judgment.

**D. Breach of Contract**

■ Spires claims that "[t]he consent decree expressly and unambiguously requires that Sunflower 'reinstate the plaintiff [Spires] as a participant in defendant's [Sunflower's] group employee medical plan'" and that "[i]t is uncontroverted that the plaintiff is not currently so covered" (Doc. 95 at 14). "[A] consent decree or order is to be construed for enforcement purposes basically as a contract ...." *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975). Ordinary principles of contract interpretation thus apply.

If a contract is unambiguous, the contract should be enforced according to its terms. Language in a contract is ambiguous if the words in the contract are subject to two or more possible mean-

ings. The court need not look beyond the four corners of the contract where the parties have reduced their agreement to written form and the document is unambiguous on its face. "Reasonable rather than unreasonable interpretations of contracts are favored and results which vitiate the purpose or reduce the terms of a contract to an absurdity should be avoided."

*Thomas Well Serv., Inc. v. Williams Natural Gas Co.*, 873 F.Supp. 474, 484 (D.Kan. 1994) (citations omitted); *see also Wichita Investors, L.L.C. v. Wichita Shopping Ctr. Assocs., L.P.*, 2003 WL 21382476, at *2 (D.Kan. June 5, 2003) (noting that if the contract is "complete and unambiguous on its face, the court must determine the parties' intent from the four corners of the document, without regard to extrinsic or parol evidence").

The Supreme Court has reiterated the "four corners" approach in the context of a consent judgment, stating that

[c]onsent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, *the scope of a consent decree must be discerned within its four cor-*

*ners, and not by reference to what might satisfy the purposes of one of the parties to it.*

United States v. Armour & Co., 402 U.S. 673, 681–82, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971) (emphasis added).

#### 1. Active or Disabled

The consent judgment states that "[d]efendant will immediately reinstate the plaintiff as a participant in defendant's group employee medical plan." Spires claims that "Sunflower's obligation under the consent judgment was to provide the plaintiff coverage as an active employee" so that "the plan would be primary to Medicare," and under then existing law, the group employee medical plan was necessarily the primary payer of Spires' claims (Doc. 95 at 15). But pursuant to the Revenue Reconciliation Act of 1993, Medicare could be treated as the primary payer of Spires' medical claims under the NRECA medical plan in which Spires was enrolled because she was a disabled employee not actively working, and nothing in the consent judgment expressly precluded that result or now supports the interpretation favored by Spires.

The consent judgment makes no explicit distinction between "active employee" and "disabled employee" designations. Spires recognizes this but contends that "the language of the Consent Judgment, the circumstances surrounding the Consent Judgment, and the subjective intent of the parties, clearly establish the intent of the agreement" (Doc. 95 at 15). In light of the four-corner maxim of *Armour,* however, the court is unwilling to go beyond the bounds of the consent judgment to impute to it an agreement that Spires be given an employment status for medical benefit purposes opposite her actual status as a disabled employee.[7]

The court finds implicitly within the wording of the consent judgment some evidence that the parties intended to provide Spires medical benefits per a "disabled employee" status. The fifth paragraph of the consent judgment says that "[d]efendant shall have no obligation to reinstate plaintiff as an employee even if plaintiff should cease to be totally disabled." Furthermore, language in the third paragraph of the consent judgment requiring Sunflower to pay all claims due under the terms of the plan "while plaintiff is on long-term disability or until such time as plaintiff is employed and covered under another employer's group medical plan" specifically contemplates that Spires was not an active employee and was not considered as such at the time of the agreement but instead was to be reinstated as a disabled employee.

Spires' claim that Sunflower agreed to treat her as "active" only for medical benefit purposes and not for actual employment purposes is not lost on the court. However, nothing in the consent judgment expressly or impliedly advances that contention, and Spires' argument in support is not persuasive. She claims that "[b]ecause she had been an active employee, the term 'reinstated' plainly means that she would be reinstated to her previous benefits as an active employee." She further notes that the termination provisions of the consent judgment, providing for continued coverage while plaintiff is on long-term disability or until such time as plaintiff is employed and covered under another employer's group medical plan, imply an intent by Sunflower to provide her coverage available to an active employee. Finally,

---

7. Spires herself states that "[t]here is evidence in this case that the plaintiff was 'classified' for various purposes as a former disabled employee (which she was)" (Doc. 95 at 17).

Spires presents evidence that a Sunflower official said, "[T]his was a very unique situation whereas Miss Spires' coverage would be continued as if she were an active employee. However, she is not an active employee" (Doc. 95 at 15–16).

 Defendants readily admit that they intended Spires to "receive the 'same coverage' as an active employee," meaning that "she was not going to pay premiums, which other non-active employees had to pay to obtain benefits under the Sunflower Self–Insured Medical Plan," but that "it was never the parties' intent that she would be classified as an active as opposed to inactive employee" (Doc. 55 ¶ 2). In any event, the meaning behind "reinstated" does not so plainly imply that the private medical plan was to be the primary payer of Spires' claims, and the court will not look beyond the four corners of the consent judgment to find the existence of such an agreement where the consent judgment itself contains no express or implied direction to do so. The court rules that the consent judgment does not require that a private medical plan be the primary payer of Spires' claims over Medicare.[8] The consent judgment simply requires Sunflower to pay all premiums and future claims due under the terms of the plan, regardless of how primary and secondary methods of payment are coordinated within the confines of that plan.

### 2. NRECA Medical Plan or Blue Cross and Blue Shield Medical Plan

The consent judgment states that "[d]efendant will immediately reinstate the plaintiff as a participant in defendant's group employee medical plan." In February 2000, Sunflower transferred all of the NRECA Medical Plan participants, except for Spires, into a plan with Blue Cross and Blue Shield of Kansas. The court now considers whether the consent judgment requires that Spires be included in the Blue Cross and Blue Shield plan.

 Under Kansas law, "[t]o be ambiguous, 'a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language.'" *Steinle v. Knowles*, 265 Kan. 545, 551, 961 P.2d 1228 (1998) (quoting *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 693, 840 P.2d 456 (1992)). Courts are "to use common sense and not to strain to create an ambiguity in a written instrument when one does not exist." *Allied Mut. Ins. Co. v. Moeder*, 30 Kan.App.2d 729, 48 P.3d 1, 4 (Kan.Ct.App.2002). The key language of the consent judgment, the phrase "defendant's group employee medical plan," is, however, ambiguous. On one hand, Sunflower contends that it refers specifically to the plan then in existence at the time the parties settled Spires' initial lawsuit. On the other, Spires argues that the phrase refers to the plan Sunflower generally retains for its employees, now the Blue Cross and Blue Shield medical plan.

According to defendants, "nothing in the Consent Judgment explicitly prohibits Sunflower from amending its Medical Plan after the Consent Judgment was entered

---

8. NRECA claims that Spires' claim is barred under the five-year statute of limitations applicable under Kansas law. *See* Kan. Stat. Ann. § 60–511(1); *see also Graphic Tech., Inc. v. Pitney Bowes Inc.*, 968 F.Supp. 602, 606 (D.Kan.1997) (noting that the statute of limitations begins to run at the time of the breach, regardless of whether plaintiff is aware of the breach). But the parties dispute the date upon which the breach occurred. In light of the court's ruling, it need not resolve the matter.

The court also notes that its ruling necessarily precludes a finding of contempt with respect to Spires' assertion that the consent judgment requires that a private medical plan be the primary payer of Spires' medical claims over Medicare.

to create additional Sunflower group employee plans" or limits its "right to amend, modify, terminate or otherwise alter the nature and scope of its benefit plan" (Doc. 55 at 19–20). Spires responds, however, that "[t]he defendant's apparent argument is that Sunflower can place the plaintiff in any plan it wishes with whatever provisions, separate from the plan provided all other employees, and still comply with the Consent Judgment simply by placing its name on the substitute plan" (Doc. 99 at 2–3).

■ The court disagrees with Spires and instead believes defendants' position to be that the consent judgment requires that Spires' medical coverage be "modeled on the NRECA plan" (Doc. 55 at 20). The court nevertheless does not think it reasonable to construe the consent judgment to allow Sunflower to maintain a separate employee benefit plan solely for Spires. *See United Tunneling Enters., Inc. v. Havens Constr. Co.,* 35 F.Supp.2d 789, 794 (D.Kan.1998) ("Reasonable interpretations, rather than unreasonable ones, are favored by the law.").

In the agreement embodied by the consent judgment, the parties did not contract for a separate and distinct plan. They could easily have specified in the consent judgment that Sunflower was to reinstate

Spires as a participant in the "Sunflower Self–Insured Medical Plan" or the "NRECA Medical Plan" or any other plan. But they did not and instead referred generally to "defendant's group employee medical plan." Reasonably interpreted, that general terminology necessarily concerns the medical plan applied by Sunflower to its employees, now the Blue Cross and Blue Shield plan.[9]

■ The court thus rules that the consent judgment requires Spires to be placed, along with Sunflower's other employees, in the Blue Cross and Blue Shield plan.[10] The court's decision renders Sunflower liable for any damages resulting from the breach of the consent judgment. But the court also determines that the language of the consent judgment is not sufficiently clear so as to justify a finding of contempt. *See Reliance Ins. Co. v. Mast Constr. Co.,* 84 F.3d 372, 377 (10th Cir.1996) (noting that a finding of contempt requires that the consent judgment be clear and unambiguous). The court therefore denies Spires' request that Sunflower be held in contempt for violating the consent judgment. *See Consumers Gas & Oil v. Farmland Indus., Inc.,* 84 F.3d 367, 370 (10th Cir.1996) (stating that the court has broad discretion in using its

---

**9.** Persuasive, at least to some degree, is the fact that Sunflower transferred Spires and its employees, as a single group, from the Sunflower Self–Insured Medical Plan to the NRECA Medical Plan. The court's consideration of the transfer is proper. Kansas courts have held that "[w]here the contract is ambiguous or uncertain, intent of the parties is ascertained by considering all language employed, circumstances existing when the agreement was made, the object sought to be obtained, and other circumstances which tend to clarify the intention of the parties." *Jayne v. Kennedy & Coe, L.L.C.,* 26 Kan.App.2d 121, 123, 978 P.2d 951 (Kan.Ct.App.1999); *see also Universal Motor Fuels, Inc. v. Johnston,* 260 Kan. 58, 63, 917 P.2d 877 (1996). Though Sunflower

claims that the transfer had no effect on Spire's medical coverage and is thus irrelevant (Doc. 51 ¶ 11), the transfer, at a minimum, evinces Sunflower's willingness to remove Spires from the Sunflower Self–Insured Medical Plan, the specific plan in existence at the time the parties settled Spires' initial lawsuit.

**10.** Because Sunflower did not transfer all of the other NRECA Medical Plan participants to a plan with Blue Cross and Blue Shield of Kansas until February 2000, Spires' claim is not barred by the five-year statute of limitations applicable to breach-of-contract claims. *See* Kan. Stat. Ann. § 60–511(1).

power to hold parties in contempt for failing to adhere to court orders).

## V. CONCLUSION

Spires sought an order limited to the substantive issues in the case, thus "preserving for later trial or hearing only the amount of her damages and fees" (Doc. 95 at 2). In light of Spires' request and because the parties have presented little information to the court regarding damages, the court expresses no opinion on the issue at this time.

The motion filed by Sunflower is GRANTED with respect to Spires' contempt and ERISA claims and with respect to Spires' claim that the consent judgment requires that Sunflower's medical plan be treated as the primary payer over Medicare, and DENIED with respect to Spires' claim that the consent judgment requires her inclusion in Sunflower's current group employee medical plan with Blue Cross and Blue Shield. Because NRECA neither owes a legal duty to nor has a contractual relationship with Spires, NRECA's motion for summary judgment is GRANTED. Spires' motion is thus GRANTED only with respect to her claim that the consent judgment requires her inclusion in Sunflower's current group employee medical plan with Blue Cross and Blue Shield. Her motion is DENIED with respect to the contempt, ERISA and third-party contract claims and with respect to her claim that the consent judgment requires that Sunflower's medical plan be treated as the primary payer over Medicare.

A motion for reconsideration is neither invited nor encouraged. Any such motion shall not exceed 3 double-spaced pages and shall strictly comply with the standards enunciated by this court in *Comeau v. Rupp*, 810 F.Supp. 1172, 1174 (D.Kan. 1992). The response to any motion for reconsideration shall not exceed 3 double-spaced pages. No reply shall be filed.

IT IS SO ORDERED.