**FREIGHTQUOTE.COM, INC., Plaintiff,**

v.

**HARTFORD CASUALTY INSURANCE COMPANY, Defendant.**

No. CIV.A. 02–2316–CM.

United States District Court, D. Kansas.

Oct. 21, 2003.

control over Kinslow's activities to impute vicarious liability.

Chad C. Lucas, Kathleen A. Hardee, Matthew A. Culp, Robert A. Henderson, Shughart Thomson & Kilroy, PC, Kansas City, MO, for Plaintiff.

James C. Morrow, Morrow, Willnauer & Klosterman, LLC, Kansas City, MO, Kurt D. Maahs, Morrow, Willnauer & Klosterman, LLC, Lincoln, NE, for Defendant.

## MEMORANDUM AND ORDER

MURGUIA, District Judge.

Plaintiff Freightquote.com, Inc., alleges in this action that defendant Hartford Casualty Insurance Company wrongfully refused to defend or indemnify plaintiff in a lawsuit brought by Gateway Transportation Services (Gateway) against plaintiff in Miami–Dade County, Florida. In its Verified Complaint, Gateway alleged that plaintiff interfered with its contractual and business relationships. This matter comes before the court on plaintiff's Motion for Summary Judgment (Doc. 48) and defendant's Motion for Summary Judgment (Doc. 47).

## I. Facts [1]

Plaintiff is in the business of freight brokerage, acting as an intermediary between shippers and carriers through its website known as Freightquote.com. At that website, shippers can schedule shipments through plaintiff, as a broker, with a variety of carriers with whom plaintiff contracts. Personalshipper.com was a third-party shipper that marketed plaintiff's services though a web page created by plaintiff. The web page used by Personalshipper.com had its logo on it and was made to look like its own web page, but it was essentially an agent of plaintiff.

Gateway is also in the freight brokerage business. In 2000, Gateway scheduled shipments on behalf of itself and on behalf of various Gateway customers through Personalshipper.com. Gateway was billed $146,682.91 for shipments which it sched-

---

1. Both parties have moved for summary judgment. The court may therefore assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts. *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir.1997).

uled through Personalshipper.com on behalf of itself and its customers. Plaintiff contends that neither Gateway nor its customers ever compensated plaintiff for these shipping services. Defendant disputes this contention. In any event, plaintiff paid the various freight carriers for the shipping services rendered to Gateway.

Plaintiff asserts that it contacted an attorney named Liese Howarth, with the firm of Gallagher & Howarth, P.C. in Boston, Massachusetts, to obtain legal advice regarding plaintiff's options for collecting the money plaintiff contends Gateway owed. Plaintiff chose the option of sending a letter ("the Letter") to Gateway's customers. Ms. Howarth advised that it was alright to send the letter.

The Letter, which plaintiff sent to all of Gateway's customers, stated in pertinent part:

> Please do not pay Gateway Transportation for any of the freight services arranged through Freightquote.com. You can determine these shipments by the Bill of Ladings that read "Bill to Third Party: freightquote.com." If you have paid Gateway Transportation for these freight services, please attempt to cancel payment with your bank. . . .
>
> You are legally liable for any charges incurred through Gateway Transportation that have not been paid to the carriers by Gateway via Freightquote.com. We would like to assist you in establishing an account directly with Freightquote.com. Please call 888–595–6298 to speak with one of our New Business Sales Representatives. . . .
>
> We have notified the Florida State's Attorneys office and the FBI of Gateway Transportation's practices. Please see the recent article in the *Miami Herald*

about some of the principals at Gateway Transportation.

Attached to the Letter was a newspaper article entitled "19 from crime family indicted."[2] Plaintiff asserts that it sent the Letter to collect amounts owed on Gateway's account, but also admits that the Letter was intended to inform Gateway's customers that David Bell (an alleged principal of Gateway) was a crook, to suggest that Gateway was not trustworthy, to solicit the customers of Gateway to set up an account directly with plaintiff, and that plaintiff anticipated that the Letter would cause the customers of Gateway to call plaintiff and want to use plaintiff for their shipping.[3]

After becoming aware of the fact that plaintiff sent the Letter to Gateway's customers, Gateway initiated a lawsuit against plaintiff (Underlying Lawsuit). The Verified Complaint in the Underlying Lawsuit, to which the Letter and the *Miami Herald* article were attached, alleged that plaintiff tortiously interfered with Gateway's business expectancies and contracts. Specifically, the Verified Complaint alleged:

> The clear intent of this letter was to plant in the minds of Gateway's customers the idea that Gateway was involved in illegal activities, although it is not, and that they, therefore, could not trust Gateway and should not pay them. All of this was clearly done with the intent to solicit Gateway's customers. Additionally, by instructing those customers not to pay Gateway amounts clearly owed to Gateway, Freightquote intended to harm Gateway's business and its continued relationships with its customers. . . .

---

**2.** The article did not actually implicate Gateway or its principals; rather, it related to the indictment of two Gateway employees in an unrelated matter.

**3.** It is undisputed that plaintiff's agent-based accounts were less profitable than direct customer-based accounts.

Freightquote's direct solicitation of Gateway's customers in its letter stating in part and clearly implying in part that Gateway was converting payments, was involved in illegal activities, and should not be trusted, coupled with its request that the customers contact and "deal directly" with Freightquote, constitutes intentional and unjustified interference with Gateway's contractual and business relationships.

(Verified Complaint ¶¶ 13 & 17). Plaintiff counter claimed that Gateway owed it $146,682.91, plus prejudgment interest.

At the time Gateway filed suit against plaintiff, defendant covered plaintiff under a general commercial liability policy (the Policy). Upon receiving service of the Underlying Lawsuit, plaintiff timely notified defendant seeking coverage under the Policy. Defendant initially assigned the claim to Mario Gonzalez, one of its claims service consultants.

Mr. Gonzalez reviewed the Verified Complaint, as well as the Letter and the *Miami Herald* article attached thereto, as part of his analysis of plaintiff's claim for a defense and indemnification. Defendant also held several roundtable discussions to determine whether there was coverage. On February 6, 2001, defendant notified plaintiff by letter that it was denying coverage. Defendant stated that the damages at issue in the Underlying Lawsuit did not qualify for coverage under the Policy and that, even if the damages at issue were covered, the provision excluding coverage for intentional acts would preclude coverage.

Plaintiff reached a settlement agreement with Gateway in the Underlying Lawsuit consisting of mutual dismissals of Gateway's tortious interference claim against it, and plaintiff's counterclaim against Gateway. Plaintiff on several occasions reasserted its demand for coverage under the Policy, each of which was denied by defendant. Plaintiff brings this cause of action seeking to recover on breach of contract. Both parties agree that Kansas law applies.

## II. Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts show-

ing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Discussion

■ Defendant asserts that it has neither a duty to defend nor a duty to provide coverage to plaintiff. "The duty to defend and whether the policy provides coverage are not necessarily coextensive." *Spivey v. Safeco Ins. Co.*, 254 Kan. 237, 246, 865 P.2d 182 (1993). An insurer has a duty to defend if there is a potential for liability under the contract. *Id.* at 245, 865 P.2d 182. The determination of whether there is a duty to defend ultimately depends upon whether coverage exists under an insurance policy. *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 709–10, 732 P.2d 741 (1987) (citing *Spruill Motors, Inc. v. Universal Underwriters Ins. Co.*, 212 Kan. 681, 684, 512 P.2d 403 (1973)); *Cas. Reciprocal Exch. v. Thomas*, 7 Kan.App.2d 718, 647 P.2d 1361 (1982) (holding that insurer has no duty to defend if there is no coverage).

■ The duty to defend rests primarily on the possibility that coverage exists, and the possibility of coverage must be determined by a good faith analysis of all information the insurer may know or could reasonably have ascertained. *Aselco, Inc. v. Hartford Ins. Group*, 28 Kan.App.2d 839, 847, 21 P.3d 1011 (2001). Thus, the insurer determines if there is a potential of liability under the policy by examining the allegations in the complaint and considering any facts brought to its attention or which it could reasonably discover. "Where a petition alleges an act that is clearly not covered, for example, that the defendant acted willfully and intentionally, there would be no potential of liability under the policy for intentional acts." *Spivey*, 254 Kan. at 245–46, 865 P.2d 182.

### A. Coverage under the Policy

■ The Policy provides coverage for "personal and advertising injury," which is defined in the Policy as "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." In *Bankwest v. Fidelity & Deposit Co.*, the Tenth Circuit held that a policy provision defining "personal and advertising injury" as "the publication or utterance of a liable or slander or of other defamatory or disparaging material" provided coverage for a claim of intentional interference with business relationships. 63 F.3d 974, 981 (10th Cir.1995). Thus, under *Bankwest*, Gateway's claim against plaintiff for tortious interference with contractual and business relationships is a covered act under the Policy.

However, there is one more step in the analysis. The court in *Bankwest* never examined the applicability of any policy exclusions, most notably an intended or expected injury exclusion. In the case at hand, the Policy excludes coverage for ex-

pected or intended injuries. The court therefore turns to whether Gateway's claim against plaintiff is excluded from coverage.

## B. Exclusions under the Policy

Under the provision entitled "Expected or Intended Injury," the Policy specifically excludes from coverage " '[p]ersonal and advertising injury' arising out of an offense committed by, at the direction of or with the consent or acquiescence of the insured with the expectation of inflicting 'personal and advertising injury.' " Plaintiff admits that it intentionally sent the Letter to Gateway's customers—this is therefore not a case of mistake or accident. As such, there is no dispute that the injury alleged by Gateway arose out of an offense committed by, at the direction of or with the consent or acquiescence of plaintiff. The court therefore turns to the issue of whether plaintiff had an expectation of inflicting such injury.

■ Foremost, the court recognizes that intentional act exclusions contained in many insurance policies reflect the public policy prohibiting coverage for intentional and malicious acts. *State Farm Fire & Cas. Co. v. Falley*, 23 Kan.App.2d 21, 27, 926 P.2d 664 (1996). Under Kansas law, the intent of an insured can be inferred when the resulting injury is a natural and probable consequence of the insured's act. *Harris v. Richards*, 254 Kan. 549, 553, 867 P.2d 325 (1994). Kansas law does not require an additional showing that the insured acted with the belief that there was a substantial certainty his acts would result in injury, nor must the insurer prove that the insured acted with the specific intent to injure. *Falley*, 23 Kan.App.2d at 25, 926 P.2d 664.

■ Moreover, with respect to whether an insurer has a duty to defend, the court must examine the complaint in the underlying action and decide whether there are any allegations that arguably or potentially bring the action within coverage. *Am. Motorists Ins. Co. v. Gen. Host Corp.*, 946 F.2d 1489, 1490 (10th Cir.1991). In other words, the complaint must state facts suggesting that the case falls within the policy's coverage. Accordingly, the issue is whether the injury alleged by Gateway in the Verified Complaint-loss of business and contracts—was a natural and probable consequence of plaintiff's intentional act of sending the Letter to Gateway's clients.

■ Plaintiff contends that the purpose behind sending the Letter to Gateway's customers was to obtain payment for the shipping services which were rendered on Gateway's behalf. However, statements like these are the type of self-serving, after-the-fact subjective intent testimony that this court may not rely on in determining the natural and probable consequences of an intentional act. *See Falley*, 23 Kan.App.2d at 27, 926 P.2d at 668 (stating that "public aims are not served by an overly restrictive construction of the intentional act exclusion or by adopting a test which depends on the after-the-fact testimony of the insured about his 'subjective intent' "). The court therefore turns to information defendant knew, or could reasonably have ascertained, in denying plaintiff a defense and indemnification.

■ The Verified Complaint alleges only intentional conduct on the part of plaintiff, which is relevant to the court's analysis. *Spivey*, 254 Kan. at 245–46, 865 P.2d 182. More significantly, upon examination of the contents of the Letter, as well as the attached *Miami Herald* article, both of which were attached to the Verified Complaint, there is little doubt that the natural and probable consequence of the Letter was to intentionally disparage the business services of Gateway.

The Letter intimated that Gateway was untrustworthy and involved in criminal ac-

tivities. Specifically, the Letter stated: "We have notified the Florida State's Attorneys office and the FBI of Gateway Transportation's practices. Please see the recent article in the *Miami Herald* about some of the principals at Gateway Transportation." Yet the *Miami Herald* article stated that David Bell, along with several other persons, had been charged with racketeering. The article does not mention Gateway, nor does the article in any way refer to Gateway's transportation practices. As such, the *Miami Herald* article was inflammatory, and the only natural and probable consequence was to insinuate, perhaps wrongly, that Gateway could not be trusted and was involved in criminal activity.

The fact that plaintiff expected or intended Gateway to suffer a "personal and advertising injury" is further evidenced by the fact that, while the Letter implied that Gateway was untrustworthy, the Letter simultaneously solicited the business of Gateway's customers. The Letter instructed Gateway's customers not to pay Gateway, and even to cancel payment with their bank if they already had sent a check to Gateway. Such statements show that plaintiff sought to affect the amounts owed to Gateway, as well as Gateway's relationships with its customers. The Letter then directed Gateway's customers to "New Business Sales Representatives" to set up a new account with plaintiff. The only natural and probable consequence was that Gateway's customers would call plaintiff and set up new accounts.

Plaintiff asserts that the fact that plaintiff consulted with legal counsel before sending the Letter is an important factor in determining whether there was an intent to interfere with Gateway's contractual and business relations. However, even considering this factor, the court cannot escape the conclusion that the Letter, on its face, shows that plaintiff in-

tended to injure Gateway. The Letter requested that Gateway customers pay plaintiff directly, and, if they already had paid Gateway, to stop payment. Obviously, Gateway's business would be injured if its customers either did not pay or canceled payments already sent. The Letter also stated that plaintiff would like to assist Gateway's customers in establishing an account directly with plaintiff and to call to speak to one of its "New Business Sales Representatives." The obvious consequence in including this language was for Gateway's customers to establish a direct account with plaintiff, especially when coupled with plaintiff's reference to Gateway's alleged criminal activities. All these factors taken together clearly demonstrate that the natural and probable consequence of plaintiff's dissemination of the Letter was to injure Gateway's contractual and business relations.

The court concludes that the "Expected or Intended Injury" exclusion applies to the claims asserted by Gateway against plaintiff. Because there is no possibility of coverage, the court finds that defendant has no duty to defend plaintiff against those claims and no duty to indemnify plaintiff. Defendant's motion for summary judgment is granted.

**IT IS THEREFORE ORDERED** that plaintiff's Motion for Summary Judgment (Doc. 48) is denied, and defendant's Motion for Summary Judgment (Doc. 47) is granted. This case is dismissed.