No. 77,288

B. Nathalie Steinle, *Appellant*, v. Richard G. Knowles d/b/a F.S. Allen Abstract and Title Company; Chicago Title Insurance Company; and F.S. Allen Abstract and Title Company, Inc., *Appellees.*

Chicago Title Insurance Company, *Appellee*, v. Ervyl L. Steinle, *Defendant*, and B. Nathalie Steinle, *Appellant.*

(961 P.2d 1228)

Opinion filed July 10, 1998.

*Christopher A. McElgunn*, of Klenda, Mitchell, Austerman & Zuercher, L.L.C., of Wichita, argued the cause and was on the briefs for appellant.

*Kenneth G. Gale*, of Adams, Jones, Robinson & Malone, Chtd., of Wichita, argued the cause and was on the brief for appellees.

*Peter C. Dietze*, of Dietze & Davis, P.C., of Boulder, Colorado, and *Gerald L. Goodell*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, were on the brief for *amicus curiae* American Land Title Association.

The opinion of the court was delivered by

ABBOTT, J.: The Chicago Title Insurance Company (Chicago Title) requests this court to reverse a Court of Appeals decision requiring Chicago Title to defend a case pending in the trial court arising out of a title to real estate that was not marketable. See *Steinle v. Knowles*, 24 Kan. App. 2d 568, 948 P.2d 670 (1997).

Ervyl L. and B. Nathalie Steinle owned real estate they contracted to sell to Donald L. and Guyla M. Glaesman. As part of the sale price, the Steinles received a mortgage for $35,000 from the Glaesmans. The Steinles purchased a loan policy from Chicago Title in the amount of $35,000. A title insurance policy was also purchased, insuring the Glaesmans' title. The title policy is not involved in this appeal. When the Steinles conveyed the land to the Glaesmans, they did not use the description that was on the instrument conveying title to them. Instead, they used a legal description obtained from a survey they had performed after they acquired the property. The survey used included land the Steinles could not legally convey. The Glaesmans brought an action against the Steinles alleging false representation, negligent misrepresentation, and breach of warranty of title.

This case involved additional defendants and other issues when it came before the Court of Appeals. The parties involved in this petition for review, however, are only Chicago Title and B. Nathalie

Steinle. (The Steinles are now divorced.) The sole issue upon which Chicago Title petitions this court to review is the Court of Appeals' ruling that required Chicago Title to provide a defense for Steinle under her title insurance loan policy, in the action brought by the Glaesmans against Steinle for breach of her warranty of title as a seller of the real property, when the Glaesman litigation did not challenge the validity of her mortgage.

In the trial court, Steinle brought suit against Richard G. Knowles, d/b/a F.S. Allen Abstract and Title Company, Chicago Title Insurance Company, and F.S. Allen Abstract and Title Company, Inc. (Allen Abstract). In its explanation of the facts, the Court of Appeals noted that Steinle alleged, in relation to the title insurance policy issued by Chicago Title, breach of contractual duty to defend, negligent misrepresentation, and breach of warranty. Also, "[i]n another suit, which was consolidated with Steinle's claim, Chicago Title sued Steinle and her husband, Ervyl Steinle, under a subrogation clause in the title insurance policy to recover monies it expended to satisfy a claim by a third party under the title insurance policy." 24 Kan. App. 2d at 568-69.

The trial court granted Chicago Title, Richard G. Knowles, and Allen Abstract's motions for summary judgment and denied Steinle's motion for summary judgment. In granting summary judgment for Chicago Title, the trial court held that the title insurance contract did not require Chicago Title to provide Steinle a defense. The trial court also granted Chicago Title's subrogation claim against Steinle and ordered her to pay $7,423.78 in damages. The trial court reasoned that "[t]he loan title policy issued to [Steinle] provides no coverage for her defense of an action brought against her as seller of property. She was an insured only as to the mortgage title policy."

The Court of Appeals recognized the following stipulated facts and exhibits:

"In 1972, the subject property was deeded to Steinle from the previous owners with the following legal description: The west 33 acres (more or less) of the N ½ of the NE ¼ of Section 9, TWP 27, Range 3 East, located in Butler County, Kansas.

"In 1986, Steinle entered into a contract to sell the property to Don and Guyla Glaesman. The contract utilized a legal description different from the description in the original deed to Steinle. The new legal description was obtained from a survey Steinle had performed some years earlier. The new legal description included property to which Steinle did not have title, including a 2-rod strip on the east side of the property and parcels on the north side which belonged to the Kansas Turnpike Authority (KTA).

"The purchase contract with the Glaesmans provided for a portion of the purchase price to be paid through a promissory note to Steinle in the amount of $35,000, to be secured by a mortgage held by Steinle.

"Steinle and the Glaesmans ordered title insurance from Chicago Title. Chicago Title issued a title insurance commitment through Knowles, an authorized agent. Steinle does not remember whether she reviewed the title commitment before closing.

"The Glaesmans and Steinle closed on the contract in March 1986. Allen Abstract handled the closing. A warranty deed from Steinle to the Glaesmans and a mortgage from the Glaesmans to Steinle were issued, both using the new legal description. Steinle signed the warranty deed to the buyers. The deed purported to convey property to which Steinle did not have good and complete title. Chicago Title issued title insurance policies to the Glaesmans' title and to Steinle.

"Steinle paid a portion of the Glaesmans' title insurance premium and a closing fee to Allen Abstract. No other monies were paid to the Glaesmans by Steinle.

"Later in 1986, a dispute arose concerning the ownership of the east 2 rods of the property. A quiet title action was begun, and Steinle was added as a party to that action. To resolve this action, Steinle expended funds for legal counsel and in the final settlement. The quiet title action was settled.

"In March 1993, the Glaesmans brought an action against all the parties in this case, among others. They alleged that Steinle misrepresented various features of the property, including the ownership of the property held by the KTA and included within the legal description conveyed. At the time of the pretrial conference, the claim also alleged a breach of warranty title.

"Steinle requested that Chicago Title provide a defense in the litigation. The request was refused, and Steinle provided for her own defense. At no time during the litigation was the validity of Steinle's mortgage on the property challenged. As a result of the alleged title defect, the value of the subject property was never reduced below the balance of the promissory note held by Steinle from the Glaesmans.

"During the Glaesman litigation, Steinle filed claims against Chicago Title. The parties to the present action stipulated to an order reserving claims.

"In 1994, Chicago Title purchased the KTA property for the Glaesmans, thus curing the title. Steinle reduced the mortgage by $2,000 as a contribution to the settlement of the Glaesman litigation.

"Steinle first filed her claim of negligence against Knowles and Allen Abstract on June 7, 1993, in her amended answer and cross-claim in the Glaesman litiga-

tion. The title commitment and the title insurance policies issued by Chicago Title did not exclude from coverage the interest held by the KTA. The interest held by the KTA was of public record." 24 Kan. App. 2d at 569-70.

The Court of Appeals reasoned there was a possibility that the Glaesman litigation fell within the policy's coverage. The Court of Appeals also ruled that although the intent of the Chicago Title policy may have been to restrict coverage only to the extent necessary to protect the value of the mortgage, its policy did not clearly restrict the coverage to this extent:

"Insureds are not required to engage in linguistic gymnastics to ascertain the intent of the insurer. Titling the contract a loan policy does not abrogate the clear language of the policy. The language of a policy purporting to restrict coverage must do so clearly. Chicago Title at least guaranteed clear title up to $35,000. Under the language of this policy, it is liable for damages up to that amount and to provide a defense." 24 Kan. App. 2d at 574.

In its petition for review, Chicago Title states that the loan policy was a standard form used nationwide and, consequently, the potential impact of the decision in this case is extensive. Counsel and this court could not find a similar case to the one presented in the case at hand that has been litigated in any other jurisdiction. On April 30, 1998, the attorneys for American Land Title Association filed an *amicus* brief in support of Chicago Title's position in this case.

This case involves the interpretation of the contract between Steinle and Chicago Title.

"As a general rule, the interpretation or construction and meaning and legal effect of written instruments are matters of law exclusively for the court and not questions of fact for determination by the jury. *Federal Land Bank of Wichita v. Krug*, 253 Kan. 307, 311, 856 P.2d 111 (1993). Regardless of the construction given a written contract by the trial court, an appellate court may construe a written contract and determine its legal effect. *Kennedy & Mitchell, Inc. v. Anadarko Prod. Co.*, 243 Kan. 130, Syl. ¶ 1, 754 P.2d 803 (1988).

"Insurance policies are to be enforced as written so long as the terms do not conflict with pertinent statutes or public policy. Where terms are ambiguous, the policy shall be construed to mean what a reasonable person in the position of the insured would have understood them to mean. A policy is not ambiguous, however, unless there is genuine uncertainty as to which of two or more possible meanings is proper. *House v. American Fam. Mut. Ins. Co.*, 251 Kan. 419, Syl. ¶

3, 837 P.2d 391 (1992)." *Spivey v. Safeco Ins. Co.*, 254 Kan. 237, 240, 865 P.2d 182 (1993).

Steinle and Chicago Trust entered into an insurance contract titled "American Land Title Association Loan Policy." This policy states:

"SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS CONTAINED IN SCHEDULE B AND THE PROVISIONS OF THE CONDITIONS AND STIPULATIONS HEREOF, CHICAGO TITLE INSURANCE COMPANY, . . . insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the amount of insurance stated in Schedule A, and costs, attorneys' fees and expenses which the Company may become obligated to pay hereunder, sustained or incurred by the insured by reason of:

1.   Title to the estate of interest described in Schedule A being vested otherwise than as stated therein;

2.   Any defect in or lien or encumbrance on such title;

3.   Lack of a right of access to and from the land;

4.   Unmarketability of such title;

5.   The invalidity or unenforceability of the lien of the insured mortgage upon said estate or interest except to the extent that such invalidity or unenforceability, or claim thereof, arises out of the transaction evidenced by the insured mortgage and is based upon

(a)   usury, or

(b)   any consumer credit protection or truth in lending law;

6.   The priority of any lien or encumbrance over the lien of the insured mortgage;

7.   Any statutory lien . . . ; or

8.   The invalidity or unenforceability of any assignment . . . of the insured mortgage or the failure of said assignment to vest title to the insured mortgage in the named insured assignee free and clear of all liens."

In the "Conditions and Stipulations" section of the title policy, a section entitled "Defense and Prosecution of Actions" provides:

"The Company, at its own cost and without undue delay, shall provide for the defense of an insured in all litigation consisting of action or proceedings commenced against such insured, or defenses, restraining orders or injunctions interposed against a foreclosure of the insured mortgage or a defense interposed against an insured in an action to enforce a contract for sale of the indebtedness secured by the insured mortgage, or a sale of the estate or interest in said land, to the extent that such litigation is founded upon an alleged defect, lien, encumbrance, or other matter insured against by this policy."

The question presented is whether the title insurance policy limits Chicago Title's duty to defend Steinle to only those litigations

asserting the invalidity of Steinle's mortgage. This issue requires the interpretation of Chicago Title's policy and a determination as to whether or not the contract provided a potential for liability. If a potential for liability existed, Chicago Title had a duty to defend. The trial court, however, found no potential for liability existed under the policy and reasoned that "[t]he loan title policy issued to [Steinle] provides no coverage for her defense of an action brought against her as seller of property. She was insured only as to the mortgage title policy." The trial court also made the following ruling on the summary judgment motions:

"Ms. Steinle received the mortgage title policy in her role as mortgage lender, not in her role as seller. And that's the context that that broad, admittedly broad, insurance coverage provision has to be interpreted, and I don't think she's entitled to stretch the coverage even for the purpose of the duty to defend, stretch the purpose of the mortgage title insurance contract to cover defense of her need for a defense as seller in the transaction. She was an insured, but only as to the mortgage title insurance policy."

Several legal standards should be kept in mind when analyzing the insurance contract. "Regardless of the construction given a written contract by the trial court, an appellate court may construe a written contract and determine its legal effect." *Federal Land Bank of Wichita v. Krug*, 253 Kan. 307, Syl. ¶ 2, 856 P.2d 111 (1993). "Where the language of the contract is clear and can be carried out as written, there is no room for construction or modification of its terms." *Metropolitan Life Ins. Co. v. Strnad*, 255 Kan. 657, Syl. ¶ 8, 876 P.2d 1362 (1994). "Whether an ambiguity exists in a written instrument is a question of law to be decided by the court. [Citation omitted.]" *Kennedy & Mitchell, Inc. v. Anadarko Prod. Co.*, 243 Kan. 130, 133, 754 P.2d 803 (1988). To be ambiguous, "a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 693, 840 P.2d 456 (1992).

Further, the language of the contract must be construed against Chicago Title because it prepared the contract and its language. See *Gowing v. Great Plains Mutual Ins. Co.*, 207 Kan. 78, 80, 483 P.2d 1072 (1971). The *Gowing* court also stated:

"Typical of the adhesion contract, and one of its most prominent examples, is the insurance contract or policy, which possesses the distinctive characteristic of unequal bargaining strength or bargaining status between seller and purchaser, or the insurer and the insured. [Citation omitted.]

"The terms of today's standard insurance policy are predetermined by the insurance carrier itself and, long in advance of the individual insurance sale, those terms have been incorporated into the insurance package presented to the prospective buyer. . . . The buyer's freedom of choice in selecting a policy is severely limited; if he desires casualty insurance he must normally accept the printed policy with the usual printed provisions—else he can leave it." 207 Kan. at 80.

In the Glaesman litigation, the Steinles were alleged, as sellers, to have made false representations about the location and nature of a road on the property and that the property could be developed. The Glaesmans also alleged negligent misrepresentation and breach of warranty of title against the Steinles. Chicago Title recognizes its duty to defend when a potential of liability exists under the policy. It asserts, however, that the Glaesman litigation alleges acts that are clearly not covered by the policy; thus, there is no potential of liability and, consequently, no duty to defend. See *Spivey*, 254 Kan. 237, Syl. ¶ 4.

Chicago Title argues that the policy's language plainly manifests coverage for Steinle as a mortgagee, not as a seller, and if Steinle had not been the holder of the mortgage, there would have been no mortgage policy. The Glaesmans clearly held title to less than what they had bargained for and although Steinle's alleged acts ultimately affected her mortgage title, the Glaesman litigation involved Steinle's acts as a seller. If the Glaesmans had obtained conventional financing and a mortgage through a bank, the question of coverage under mortgage title insurance would never have become an issue.

Chicago Title additionally contends that paragraph 5 of its policy highlights the paradoxical ruling of the Court of Appeals. Paragraph 5 allows Chicago Title to purchase the indebtedness instead of defending an action. If Chicago Title had purchased the indebtedness in this case, by buying the $35,000 mortgage, it would have paid for and been assigned the mortgage, without ending or affecting the Glaesmans' civil action against Steinle, which was unrelated to the mortgage. Furthermore, Steinle did not have an

owner's title policy covering her title to the land and she is attempting to use her loan policy as an owner's policy. This is neither the intent nor the effect of the loan policy that Chicago Title had with Steinle.

The trial judge noted the importance of Steinle's position as a seller and commented that

"she's got two hats on. And she was sued in that suit, as the seller in the transaction, not as the mortgagor, and although, ultimately, if that had gone full course and they would have been successful, there would have been an [effect] upon her mortgage interest, but that didn't present itself as a legal challenge to the—didn't present itself as a loss to her as a mortgagee."

Therefore, he determined:

"The loss that she was going to suffer was because she had been a seller. If we would have been talking about Bank IV as the mortgagee, an independent party, Bank IV would have gotten nervous about that lawsuit, because, in a business sense, it would affect the collectability of the mortgage. But I don't think that the title insurance company would have had a duty to step in and defend. She wouldn't have been named, if it would have been a third independent party there, wouldn't have been named in that suit."

Both parties cite to *Spivey*, 254 Kan. 237, in support of their positions. In *Spivey*, the appellant-insured filed his action against Safeco Insurance Company (Safeco) and American Manufacturers Mutual Insurance Company (AMMIC), alleging that they had breached their contract to defend him in a civil tort action. Spivey was a superintendent of a department for General Motors Corporation. A female employee in Spivey's department filed suit against him, alleging that he had made sexual demands and committed intentional torts of assault, battery, and infliction of emotional distress and that he had intentionally inflicted bodily harm upon her. Spivey requested that his insurance carriers defend him, but they refused. After successfully defending the suit without their assistance, Spivey filed an action against Safeco and AMMIC, alleging breach of contract for failure to defend him in a federal action. 254 Kan. at 238-39.

The trial court granted summary judgment in favor of the insurance companies. This court affirmed, holding that the insurance contract was not ambiguous and that the exclusionary clause of the

contract applied to Spivey's situation. The exclusionary clause excluded from coverage an insured's intentional acts. The *Spivey* court held that the insurance companies had no duty to defend because Spivey was not sued for having sex with the employee, but for intentionally injuring her by threats with a knife and gun, by shooting a gun at her, and by forcing sexual acts upon her. The term "accident" in Spivey's policy did not cover this situation because the alleged acts were intentional.

Thus, the *Spivey* court ultimately held:

"Under the present code of civil procedure, an insurer must look beyond the effect of the pleadings and must consider any facts brought to its attention or any facts which it could reasonably discover in determining whether it has a duty to defend. If those facts give rise to a 'potential of liability,' even if remote, under the policy, the insurer bears a duty to defend. *MGM, Inc. v. Liberty Mut. Ins. Co.*, 253 Kan. 198, 202, 855 P.2d 77 (1993). The duty to defend rests primarily on the possibility that coverage exists, and the possibility of coverage must be determined by a good faith analysis of all information the insurer may know or could have reasonably ascertained. If ambiguities in coverage, including exclusionary clauses, are judicially determined against the insurer, the ultimate result controls the insurer's duty to defend. [Citation omitted]." 254 Kan. at 245-46.

*Spivey* holds that "[t]he duty to defend and whether a liability insurance policy provides coverage are not necessarily coextensive. The duty to defend arises whenever there is a 'potential for liability' under the policy. Where a petition alleges an act that is clearly not covered, there would be no potential of liability under the policy." 254 Kan. 237, Syl. ¶ 4. Thus, Chicago Title avers that Steinle's acts that created the Glaesman litigation were clearly not covered under its policy and, consequently, no potential for liability existed.

The Court of Appeals found that the language of the policy as "it applies to this factual situation is difficult to grasp." 24 Kan. App. 2d at 574. Therefore, Chicago Title's policy did not limit its coverage to exclude litigation arising from Steinle's position as a seller. Chicago Title asserts that "[c]ertainly it is difficult to apply a policy which, by its terms, protects a lender from losses to its mortgage caused by defects in its mortgagor's title, to an action by the buyer against the seller." Chicago Title further claims the Court of Appeals made an incorrect ruling because it held that the cov-

erage was not clearly excluded in a case where there was no coverage under the policy in the first instance.

The two title policies at issue in this case are not unusual. The buyers (the Glaesmans) owned a policy which protected them from the conveyance of a defective title by the seller (Steinle). The Glaesmans had an owner's policy. This owner's policy provided the coverage through which Chicago Title cured the title. Steinle was also the lender/mortgagee for the Glaesmans, and the coverage Steinle obtained from her policy with Chicago Title protected her mortgage from a loss caused by defective title in the mortgagor. That policy is clearly described as a "loan policy" and covers defects to the buyers' title which compromises the mortgage held by Steinle and her former husband. Steinle was sued because of a defect in the fee title that she conveyed to the buyers. The loan policy protects her from a loss to her mortgage caused by a defect in the buyers' (the borrowers') title which affects her mortgage.

Steinle's policy does not provide title insurance coverage for her, in her role as a seller. Therefore, Chicago Title had no potential for liability and did not owe a duty to defend.

The loan policy provides coverage for Steinle only in her capacity as a lender and not as a seller. Given that the Glaesmans sued her in her capacity as a seller, Chicago Title did not have a duty to defend her in the Glaesman litigation.

We reverse the Court of Appeals and affirm the trial court.