**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 8 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

FREIGHTQUOTE.COM, INC.,

Plaintiff-Appellant,

v.

HARTFORD CASUALTY
INSURANCE COMPANY,

Defendant-Appellee.

No. 03-3353

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 02-CV-2316-CM)**

---

Kathleen A. Hardee (Matthew A. Culp with her on the briefs), Shughart Thomson & Kilroy, P.C., Kansas City, Missouri, for Plaintiff-Appellant.

Kurt D. Maahs (James C. Morrow and Matthew J. Hempy with him on the brief) Morrow, Willnauer & Klosterman, L.L.C., Kansas City, Missouri, for Defendant-Appellee.

---

Before **McCONNELL** , **HOLLOWAY** , and **TYMKOVICH** , Circuit Judges.

---

**TYMKOVICH** , Circuit Judge.

---

Plaintiff-appellant Freightquote.com, Inc. appeals the district court's order

granting summary judgment in favor of defendant-appellee Hartford Casualty

Insurance Company. The district court ruled that Hartford did not have a duty to defend or indemnify Freightquote in connection with a lawsuit filed against Freightquote for tortious interference with contractual and business relations. *Freightquote.com, Inc. v. Hartford Casualty Ins. Co.*, 316 F. Supp. 2d 937 (D. Kan. 2003). We have jurisdiction over this appeal under 28 U.S.C. § 1291 (2000), and AFFIRM the district court's grant of summary judgment.

## I. BACKGROUND

*A. The Underlying Suit with Gateway*

Freightquote is a Lenexa, Kansas internet shipping broker that uses its website, freightquote.com, to act as intermediary between shippers and carriers. At its website, customers can obtain quotes on shipping services and schedule shipments from a variety of freight carriers with whom Freightquote contracts. In addition to its own website, Freightquote created other internet websites to market its services. Personalshipper.com was a third-party shipper that marketed Freightquote's services through a page created by Freightquote. Although personalshipper.com had its own logo and was made to look like its own business, it essentially operated as an agent for Freightquote. Thus, customers that scheduled shipments through personalshipper.com were in fact provided shipping services through Freightquote.

-2-

From approximately May through October 2000, Gateway Transportation Services, Inc., a freight brokerage company incorporated in Florida, scheduled numerous shipments for itself and others through the personalshipper.com website. According to Freightquote, Gateway and its customers never paid for these shipping services despite Freightquote's repeated demands for payment. Freightquote alleges that it had to pay the various freight carriers on Gateway's behalf.

Freightquote sought legal advice from an attorney in Boston, Massachusetts regarding Gateway's refusal to pay. The attorney advised Freightquote that it had a legal right to send a demand letter to Gateway's customers, and the attorney assisted in drafting such a letter. The letter stated:

Dear [Gateway Customer],

You have been accessing freight brokerage services through Gateway Transportation Services, Inc., in Ft. Lauderdale Florida. Gateway has been obtaining these freight services through freightquote.com. . . . While Gateway Transportation has been invoicing you for these freight charges; they have **NEVER** paid freightquote.com or any of our carriers for your shipments. We would like to do the following with you:

1. Please do not pay Gateway Transportation for any of the freight services arranged through freightquote.com. . . . If you have paid Gateway Transportation for these freight services, please attempt to cancel payment with your bank.
2. We will invoice you directly for all shipments made through Gateway since May 2000. Please pay freightquote.com directly and we will pay the carrier for the services provided.
3. You are legally liable for any charges incurred through Gateway Transportation that have not been paid to the carriers via

-3-

freightquote.com. We would like to assist you in establishing an account directly with freightquote.com. Please call [phone number] to speak to one of our New Business Sales Representatives.

4. We have notified the Florida State's Attorneys office and the FBI of Gateway Transportation's practices. Please see the recent article in the *Miami Herald* about some of the principals at Gateway Transportation.

The attached article, titled "19 from crime family indicted," discusses the indictment of nineteen individuals for money laundering, loan sharking, extortion, and sports gambling. Gateway itself is not mentioned in the article, although it identifies a Gateway officer as one of the "crime family" members indicted for racketeering.

Between October 31 and November 1, 2000, Freightquote sent the letter and *Miami Herald* article to numerous Gateway customers. In response to the letter, on November 13, 2000, Gateway filed a complaint against Freightquote in Miami-Dade County (the Gateway suit). Gateway alleged that the letter and *Miami Herald* article tortiously interfered with its contractual and business relations. Freightquote counterclaimed for unpaid services. It then turned to its insurer, Hartford, for a defense to the lawsuit.

B. *The Hartford Liability Insurance Policy*

At the time of the Gateway suit, Hartford insured Freightquote through a general commercial liability policy. The policy provided coverage for bodily

injury, property damage, and personal and advertising injury. The policy states in relevant part:

> We will pay on behalf of the insured those sums that the insured becomes legally obligated to pay as damages because of "bodily injury," "property damage" or *personal and advertising injury* to which this insurance applies. . . . *However, we will have no duty to defend the insured against any "suit" seeking damages . . . to which this insurance does not apply.*

(emphasis added).

The policy goes on to define "personal and advertising injury" to include, among other things, "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." Finally, the policy specifically excludes coverage for "[p]ersonal and advertising injury arising out of an offense committed by, at the direction of or with the consent or acquiescence of the insured with the expectation of inflicting personal and advertising injury" (the intentional act exclusion clause). According to Freightquote, Hartford had a duty to defend Gateway's claim for tortious interference under the policy's "personal and advertising injury" provision.

## C. Hartford's Denial of Coverage

Shortly after receiving Gateway's complaint, Hartford undertook an investigation to determine whether the Gateway suit fell within the policy's intentional act exclusion clause. On November 29, 2000, Hartford sent a letter to

Freightquote stating that an investigation was underway. Counsel for Freightquote replied on December 18, 2000, reaffirming Freightquote's demand that Hartford defend the Gateway suit and indemnify against any losses. In the letter, Freightquote's counsel cited our circuit's decision in *Bankwest v. Fidelity & Deposit Co. of Maryland*, 63 F.3d 974 (10th Cir. 1995), which held under Kansas law that a general liability insurance policy covers a claim for intentional interference with contractual and business relations. Freightquote's counsel stated in the letter that this decision entitled Freightquote to coverage in the Gateway suit.

Nevertheless, Hartford ultimately concluded that it did not have a duty to defend the Gateway suit. In a letter dated February 6, 2001, Hartford told Freightquote that "none of the allegations in the Complaint deals with damages that would qualify for coverage under the [policy] and its definitions." Specifically, Hartford stated that even if Gateway's allegations qualified as "personal and advertising injury," the policy excludes coverage due to the intentional nature of Freightquote's acts.

In May of 2001, Freightquote's counsel sent a letter for the purpose of putting Hartford on notice that settlement discussions were underway in the Gateway suit and requesting Hartford's participation in those discussions. Predictably, Hartford refused. Freightquote eventually settled the Gateway suit at

a total cost to Freightquote of approximately $150,000, and Hartford refused to indemnify against the loss. In July 2003, Freightquote filed suit against Hartford in the United States District Court for the District of Kansas.

D. *The District Court's Order*

In its lawsuit against Hartford, Freightquote alleged that Hartford breached its contractual duties to defend Freightquote and indemnify against losses in the Gateway suit. Both parties filed motions for summary judgment. The district court denied Freightquote's motion for summary judgment and granted Hartford's motion. In sum, the district court found that the policy's intentional act exclusion clause applied to Gateway's tortious interference claim. Thus, because coverage did not exist under the policy, Hartford did not have a duty to defend the Gateway suit or indemnify Freightquote's losses. This appeal followed.

## II. ANALYSIS

A. *Standard of Review*

We review de novo the grant of summary judgment to determine whether any genuine issues of material fact were in dispute and, if not, whether the district court correctly applied the substantive law at issue. *Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 792 (10th Cir. 1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

-7-

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, we view the evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *Simms v. Oklahoma ex rel. Dep't of Mental Health*, 165 F.3d 1321, 1326 (10th Cir. 1999) (citation omitted). "Summary judgment is appropriate if the evidence is such that no reasonable jury could return a verdict for the nonmoving party." *Cudjoe v. Ind. Sch. Dist. No. 12*, 297 F.3d 1058, 1062 (10th Cir. 2002) (citation and quotation omitted).

Furthermore, because this case arises under our diversity jurisdiction, Kansas law applies. *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938). "The obligation of responsible appellate review and the principles of a cooperative judicial federalism underlying *Erie* require that courts of appeals review the state-law determinations of district courts de novo." *Salve Regina College v. Russell*, 499 U.S. 225, 239 (1991).

## B. *The Duty to Defend and Indemnify*

The issue in this case is whether the district court erred in finding that Hartford had no duty to defend and indemnify Freightquote against a claim of tortious interference with contractual and business relations under the insurance contract. We first address the law regarding an insurer's duty to defend.

### 1. *The Duty to Defend*

-8-

Under Kansas law, an insurer's duty to defend arises when there is a "potential of liability" under the policy. *Spruill Motors, Inc. v. Universal Underwriters Ins. Co.*, 512 P.2d 403, 407 (Kan. 1973). "The insurer determines if there is a potential of liability under the policy by examining the allegations in the complaint and considering any facts brought to its attention or which it could reasonably discover." *State Farm Fire & Casualty Co. v. Finney*, 770 P.2d 460, 466 (Kan. 1989); *see also American Motorists Ins. Co. v. General Host Corp.*, 946 F.2d 1482, 1486 (10th Cir. 1991), *reh'g granted and opinion modified*, 946 F.2d 1489 (10th Cir. 1991). If, based on a good-faith analysis of all the information the insurer knew or could have reasonably ascertained, the insurer determines that there is a possibility of coverage, the insurer must defend the underlying lawsuit—even if the possibility of coverage is remote. *Spivey v. Safeco Ins. Co.*, 865 P.2d 182, 188 (Kan. 1993); *Spruill Motors*, 512 P.2d at 407.

An insurer does not, however, have a duty to defend where the underlying lawsuit falls "wholly outside any coverage obligations assumed in the policy or when the insurer would have no liability if plaintiff secured a judgment against the insured." *Spruill Motors*, 512 P.2d at 406. "Where a petition alleges an act that is clearly not covered, for example, that the defendant acted willfully and intentionally, there would be no potential of liability under the policy for intentional acts." *Spivey*, 865 P.2d at 188; *see also S. Cent. Kan. Health Ins.*

*Group v. Harden & Co. Ins. Servs.*, 97 P.3d 1031, 1035 (Kan. 2004) ("When there is no coverage under the insurance policy, there is no duty to defend.").

Additionally, in Kansas, intentional act exclusion clauses such as the one at issue here "reflect the public policy prohibiting coverage for intentional and malicious acts." *State Farm Fire & Casualty Co. v. Falley*, 926 P.2d 664, 668 (Kan. Ct. App. 1997) (citations omitted); *see also Shelter Mut. Ins. Co. v. Williams*, 804 P.2d 1374, 1382 (Kan. 1991) ("Excluding coverage for an intentional injury arises from the belief that an individual should not be exempt from the financial consequences of his own intentional injury to another."). Numerous cases hold that liability insurance coverage does not extend to intentional acts. *See, e.g., Spivey*, 865 P.2d 182; *Bell v. Tilton*, 674 P.2d 468 (Kan. 1983); *State Farm Ins. Cos. v. Gerrity*, 968 P.2d 270 (Kan. Ct. App. 1998).

Here, Freightquote argues that the policy's intentional act exclusion clause does not apply because Freightquote did not commit an intentional act. Aplt. Op. Br. at 19. According to Freightquote, although it intentionally mailed the letter and *Miami Herald* article to Gateway's customers, it did not intend to tortiously interfere with Gateway's contractual and business relations. In this regard, Freightquote correctly points out that Kansas law distinguishes between an intended injury and an unintended injury resulting from an intentional act. *See, e.g., Spruill Motors*, 512 P.2d at 408 (noting that "[a]n intentional act may result

-10-

in an unintended injury" and holding that the insurer had a duty to defend because the insured did not intend to injure the third party). The policy at issue in this case in fact recognizes this distinction by only excluding coverage for "expected or intended injur[ies]." Aplt. App. at 66.

Nevertheless, Freightquote's analysis goes only part way. The intentional act exclusion clause does not require Hartford to show that Freightquote acted with the specific intent to tortiously interfere with Gateway's business. *See Harris v. Richards*, 867 P.2d 325, 328 (Kan. 1994). Nor is Hartford required to show that Freightquote acted with the belief that its actions were "substantially certain" to cause injury. *See Falley*, 926 P.2d at 667. Instead, "[w]here an intentional act results in injuries which are a natural and probable result of the act, the injuries are intentional." *Spivey*, 865 P.2d at 188; *see also, e.g., Harris*, 867 P.2d at 328 ("We do not follow the specific intent rule. Rather, we have adopted the natural and probable consequences test.") (citations omitted). Thus, the question for us is not whether Freightquote specifically intended to tortiously interfere with Gateway's contractual and business relations, but whether harm to Gateway's contractual and business relations was the natural and probable consequence of Freightquote's actions.

We agree with the district court that the natural and probable consequence of Freightquote's actions was to interfere with Gateway's business. Gateway's

-11-

underlying complaint alleges in part that "Freightquote intended to harm Gateway's business and its continued relationships with its customers." Aplt. App. at 88. An insurer, however, may not make a coverage decision based solely on the plaintiff's allegations against the insured. Instead, it must consider all the information that could be reasonably ascertained regarding the insured's conduct. *Spivey*, 865 P.2d at 188.

Here, in addition to the allegations in the complaint, as part of its coverage evaluation, Hartford also had before it the letter and *Miami Herald* article. The letter insinuated or specifically stated that

(1) Gateway was an untrustworthy and dishonest business,

(2) customers should not pay Gateway for services already arranged through freightquote.com and should have their banks cancel payment if possible,

(3) customers in fact would be legally liable for amounts incurred through freightquote.com,

(4) Freightquote "would like to assist you in establishing an account directly with freightquote.com" so that the customers could bypass Gateway, and

(5) principals at Gateway were involved in criminal activity.

The newspaper article accompanying the letter cemented the point that Gateway's principals were alleged by federal prosecutors to be involved in racketeering.

Based on the above, the only conclusion a reasonable trier of fact could reach is that the natural and probable consequence of Freightquote's actions was to intentionally interfere with Gateway's contractual and business relations. Nor do we see any genuine issues of material fact that would preclude summary judgment. The language of the letter denigrates and discredits Gateway's services, affirmatively solicits Gateway's customers, threatens legal liability in the event that Gateway's customers do not directly pay Freightquote, and (together with the article) implies that Gateway is operated by crooks. Freightquote's actions thus fall squarely within the policy's intentional act exclusion clause, and, accordingly, Hartford did not have a duty to defend the Gateway suit.

The fact that Freightquote first sought legal advice before mailing the letter does not alter our conclusion. Although an attorney advised Freightquote that a letter could legally be sent to Gateway's customers, Freightquote's CEO was largely responsible for its drafting and content. Furthermore, while acting on advice of counsel is a relevant fact going to Freightquote's intent, we find that this fact alone does not overcome the only inference from the totality of circumstances: Freightquote intended to strong arm Gateway and interfere with Gateway's contractual and business relationships with its customers. There is no plausible claim here that Freightquote acted in good faith.

In short, Freightquote's conduct can only be understood as deliberate interference with Gateway's customer relations and is, therefore, excluded from insurance coverage.

2. *The Duty to Indemnify*

Freightquote also argues that Hartford breached its duty to indemnify. The duty to indemnify is narrower than the duty to defend. *American Motorists Ins.*, 946 F.2d at 1488–89. Although the duty to defend is determined by the allegations of the underlying complaint and any facts that the insurer independently knew or could have reasonably ascertained, the duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means, such as settlement. *Id.* at 1489 (citations omitted); *see also Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co.*, 71 P.3d 1097, 1126 (Kan. 2003) ("[T]he duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means.") (citations and quotation omitted).

Freightquote has not included the settlement in the record on appeal. We thus cannot say whether Hartford possibly had a duty to indemnify based on the agreed terms of the settlement in the Gateway suit. Without the settlement's terms, we have no reason to believe that the facts finally agreed to in settlement vary from those alleged in the complaint. Nor do we believe that the parties in

this case could create a factual question of coverage through stipulations in settlement documents.

Since we have already concluded that Hartford had no duty to defend Freightquote, we also readily find that Hartford had no duty to indemnify Freightquote for any amounts incurred or paid in connection with the Gateway settlement.[1] *See American Motorists*, 946 F.2d at 1489.

C.  *The* Bankwest *Decision*

Finally, Freightquote argues that our decision in *Bankwest v. Fidelity & Deposit Co. of Maryland*, 63 F.3d 974 (10th Cir. 1995) (applying Kansas law), mandates a finding that Hartford had a duty to defend. We disagree for the simple reason that *Bankwest* does not address the applicability of intentional act exclusion clauses, which is the core issue in this case. *Bankwest* is, therefore, largely beside the point.

---

[1] Although Freightquote alleges that the total cost of settlement was "in excess of $150,000," Aplt. Op. Br. at 8, it apparently paid nothing in damages. Instead, the settlement terms (as best we can discern from the oblique references in the record) merely require that both parties drop their claims and bear their own costs. Of the approximately $150,000 claimed by Freightquote, $146,682 is the amount of unpaid shipping services allegedly owed by Gateway to Freightquote. Under the policy, however, Hartford only agreed to pay "those sums that the insured becomes legally obligated to pay *as damages*." Aplt. App. at 63 (emphasis added). Thus, even if Freightquote were entitled to indemnification, Hartford would not be required to indemnify against the overwhelming majority of the losses alleged by Freightquote.

In *Bankwest*, the insured (Bankwest) held a fourth deed of trust on some property owned by the plaintiffs and located in Vail, Colorado. Several other banks also held security interests in the plaintiffs' Vail property. Bankwest's president sent letters to these other banks, falsely saying that they were estopped from advancing additional funds to the plaintiffs. The plaintiffs then filed a claim against Bankwest for intentional interference with business and contractual relations, which was eventually settled. *Id.* at 976. Bankwest sought to recover from its insurer the amount it paid to defend the underlying lawsuit. The insurer, however, refused to defend, stating that the policy did not cover intentional interference claims. *Id.* at 977.

Nothing in the *Bankwest* opinion suggests that the policy at issue contained an intentional act exclusion clause similar to the one in this case. The policy provided coverage for bodily injury, property damage, and personal injury, and defined "personal injury" in part as "the publication or utterance of a libel or slander or of other defamatory or disparaging material." *Id.* at 977. The insurer argued that it had no duty to defend the underlying lawsuit because a claim for intentional interference with business or contractual relations was not listed in the policy as a covered claim. *Id.* Bankwest, on the other hand, argued that the policy's reference to "the publication or utterance of . . . defamatory or disparaging material" was broad enough to include a claim for intentional

interference.  *Id.*  We agreed with Bankwest, holding that the policy was "broad enough to include certain claims for intentional interference with contract," *id.* at 980, and that the insurer therefore had a duty to defend the underlying lawsuit. *Id.* at 981.  The parties did not brief, nor did this court decide, the applicability of an intentional act exclusion clause.

Insurance coverage cases are contract cases—driven by the terms and conditions of the insurance policies themselves.  Our holding in *Bankwest* should not be interpreted to mean that under Kansas law all claims for tortious interference with contractual or business relations are ipso facto covered claims that give rise to an insurer's duty to defend.  Instead, *Bankwest* stands for the limited proposition that a policy provision defining "personal injury" as "the publication of . . . defamatory or disparaging material" is broad enough to encompass certain tortious interference claims.  *Id.* at 980.  In the present case, however, the parties do not dispute that Hartford's policy, which defines "personal and advertising injury" to include "publication of material that . . . disparages a person's or organization's goods, products or services," is broad enough to include a tortious interference claim.  Indeed, under *Bankwest*, there is no argument but that a claim for tortious interference falls within the policy's scope of potential coverage.  Rather, the issue raised by the parties in this case moves beyond *Bankwest*; namely, whether the policy's intentional act exclusion

vitiates Hartford's duty to defend an otherwise covered claim. *Bankwest* simply does not speak to this issue.[2]

If, as urged by Freightquote, we were to find that *Bankwest* compels a duty to defend in this case, we would necessarily need to ignore the express language of the policy's intentional act exclusion clause. Not only would we be turning our backs on Kansas's stated public policy against providing coverage for intentional acts, *see Falley*, 926 P.2d at 668, we would also contravene the principle that "[i]nsurance policies are to be enforced as written so long as the terms do not conflict with pertinent statutes or public policy." *Steinle v. Knowles*, 961 P.2d 1228, 1232 (Kan. 1998). There is no such conflict here.

## III. CONCLUSION

The natural and probable consequence of Freightquote's actions was to disparage Gateway and interfere with its contractual and business relations, and no reasonable trier of fact could have concluded otherwise. We therefore hold

---

[2] We also reject Freightquote's argument that upholding the district court's grant of summary judgment will essentially overrule and nullify *Bankwest*. Freightquote's argument rests on the false premise that all claims for tortious interference are covered claims under *Bankwest*. As we have explained, however, whether a claim is covered does not depend on the allegations in the complaint alone, but rather on an analysis of all the available facts. Indeed, as in *Bankwest*, in some circumstances an insurer may have a duty to defend against an intentional interference claim. For instance, where the allegations in the complaint and all other facts indicate that the insured did not act with the intent to injure or that injury was not a natural and probable consequence, the insurer would have a duty to defend.

that Hartford did not have a duty to defend or indemnify the Gateway suit. Accordingly, we AFFIRM the district court's order granting summary judgment in favor of Hartford.