No. 95,768

RICHARD MILLER, ED ZELLER, and JEREMY KOHN, *Appellants*, v.
WESTPORT INSURANCE CORPORATION and EMPLOYERS REIN-
SURANCE CORPORATION, *Appellees*.

(200 P.3d 419)

Opinion filed January 30, 2009.

*James C. Heathman*, of Heathman Law Office, of Topeka, argued the cause and was on the briefs for appellants.

*William A. Larson*, of Larson & Blumreich, Chartered, of Topeka, argued the cause and was on the briefs for appellees.

The opinion of the court was delivered by

BEIER, J.: This is a contract case involving an insurer's duty to defend on an errors and omissions policy.

Plaintiffs Richard Miller, Ed Zeller, and Jeremy Kohn are licensed life, accident, and health insurance agents who referred several of their clients to John F. Usher and Associated Financial Solutions, Inc. (Associated), a company offering debt adjustment services. Usher, the owner of Associated, absconded with the clients' funds while he was under investigation by the Kansas Attorney General's office. Miller, Zeller, and Kohn made claims under their professional errors and omissions insurance policies with defendants Westport Insurance Corporation (Westport) and Employers Reinsurance Corporation (Employers). Coverage was denied. The agents settled with their clients and again sought coverage. Again, they were unsuccessful; and they then filed this action. The district court granted the insurers' motion for summary judgment, and a panel of our Court of Appeals affirmed in *Miller v. Westport Ins. Corp.*, No. 95,768, unpublished opinion filed February 16, 2007. We granted the agents' petition for review.

We address the one question dispositive of this appeal: Did the lower courts err in concluding that insurers Westport and Employers had no duty to defend agents Miller, Zeller, and Kohn?

## Factual and Procedural Background

Miller has his own business, T & M Financial, Inc. (T & M), and Zeller and Kohn work with T & M as independent contractors. All three men are agents who sell insurance for Woodmen Accident and Life Insurance Company. Woodmen requires its agents to investigate clients' needs and financial ability, and it prohibits its agents from selling insurance that a client does not need or cannot afford.

In the course of their business, the agents referred certain clients to Associated, a nonprofit debt-adjustment organization, to enable the clients to pay insurance premiums and fund their purchase of other insurance products. The agents chose Associated because it was the only company that guaranteed its services would not have a negative impact on clients' credit ratings. The agents did not receive compensation for these referrals. They continued to refer clients to Associated for approximately 1 year before the agents' clients complained that their debts were not being discharged and that they could not get in touch with Associated.

Although the agents had "checked into the background" of Associated, they did not discover that it was not authorized under Kansas law to perform debt adjustment. In fact, Associated was under investigation by the Kansas Attorney General, and ultimately Usher entered into a consent judgment with the State under which he and Associated stipulated to multiple violations of the Kansas Consumer Protection Act, K.S.A. 50-623 *et seq.*; the Kansas Credit Services Organization Act, K.S.A. 50-1101 (Furse 1994) *et seq.*; and the Credit Repair Organizations Act, 15 U.S.C. § 1679 (2000) *et seq.* Usher also agreed to permanently cease improper activities. Unfortunately, none of this was enough to prevent Usher from absconding with approximately $55,000 belonging to the clients of Miller, Zeller, and Kohn.

The Attorney General also investigated T & M and Miller, Zeller, and Kohn. The agents denied any wrongdoing and refused to enter into a consent judgment, but they did execute an "Assurance of Voluntary Compliance" that agreed to reimburse their clients for monies paid to Associated.

Each of the agents was at all pertinent times covered by a professional errors and omissions policy with defendants Westport and Employers. The agents duly notified the insurers of their claim for coverage under the policy. The agents' claim included losses sustained by the 12 clients who had been referred to Associated.

The defendants denied coverage, asserting that the agents' claim did not arise out of services rendered as licensed insurance agents. The agents requested, twice, that the defendants reconsider the denial of coverage. Defendants again responded in the negative, this time also citing several policy exclusions. The agents responded, and the defendants again denied coverage.

Although the agents denied wrongdoing, faced with the cost of defending up to a dozen lawsuits, they settled their clients' claims for approximately $55,000. Apparently only two of their clients filed a lawsuit before the settlement was effected.

The agents then brought this action in the district court. Their petition alleged that "defendants' unjustifiable denial of coverage to Plaintiffs constitute[d] a breach of contract," and that, "due to defendants' breach, the [agents] incurred losses in the form of claims paid in the amount of $55,335.02, and incurred legal fees for the defense of such covered claims in the amount of $16,080.00."

The errors and omissions insurance policy on which agents relied provided coverage for loss "caused by any 'wrongful acts' committed by the 'insured agent,' arising out of the conduct of the business of the 'insured agent' in rendering services for others as a licensed life, accident and health insurance agent." It also provided that Westport and Employers would "have the right and duty to investigate, defend, conduct settlement negotiations and enter into settlements for any 'claim' or 'suit' for which coverage is provided by the terms of this policy" and would pay "all expenses incurred in the defense of any 'claim' or 'suit' against the insured alleging any covered 'wrongful act,' and seeking 'loss' on account thereof, even if the 'claim' or 'suit' is groundless, false, [or] fraudulent." The policy defines "wrongful act" or "wrongful acts" to mean "any negligent act, error, [or] omission . . . committed or alleged to have been committed by the insured agent."

The policy exclusions in Section VII state that it does not apply to:

"B. [A]ny intentional, dishonest, fraudulent, criminal or malicious act, or assault or battery committed by or contributed to by any insured; [or]

. . . .

"T. [A]ny 'claim' arising out of or in connection with a fraudulent or nonexistent entity."

A "Key Point Summary" prepared by a plan administrator for the professional liability program indicated that financial planning activities would be covered under the policy.

After discovery, the parties filed cross-motions for summary judgment. After setting out the standard governing such motions, the district court stated: "[W]hile both sides extensively debate whether the referrals occurred 'out of the conduct' [of the agents' business], neither side fully addresses whether the agents committed a 'wrongful act.'" The district judge reasoned that a "wrongful act" was defined under the policy as a negligent act; and, because there was no evidence that the agents could have foreseen Usher's theft of their clients' money, the agents were not negligent and thus did not engage in wrongful conduct. In addition, the district judge ruled, even if the agents did owe a duty to their clients, the clients' losses did not arise out of the agents' referrals to Associated. Rather, the proximate cause of the losses was Usher's theft of funds, which was not a natural and probable consequence of the agents' referral of clients to a company without the correct legal status. The judge granted the defendants' motion for summary judgment and suggested that the agents' only recourse would be to "chase the thief."

In its decision, the Court of Appeals panel came to the same conclusion as the district judge. It held that the agents' referrals to Associated were not negligent; thus no coverage was triggered. *Miller*, slip op. at 6-9. The panel also addressed the agents' argument that the question of proximate cause should have gone to a jury, concluding that the agents' conduct could not, as a matter of law, be the proximate cause of their clients' losses because the theft by Usher was not foreseeable. Slip op. at 10-12. The panel then addressed the agents' argument that the policy covered *allegations of*

negligent acts as well as the acts themselves. Although the panel agreed, it held that the agents failed to establish there had been any such allegations. Slip op. at 12-14. Rather, the Attorney General had alleged only violations of the Kansas Consumer Protection Act, the Kansas Credit Services Organization Act, and the federal Credit Repair Organizations Act; and the record on appeal did not contain the two clients' petition.

## Standard of Review

Our standard of review of a district court's grant or denial of a motion for summary judgment is well established:

" ' " 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' " ' [Citations omitted.]" *Farha v. City of Wichita*, 284 Kan. 507, 511, 161 P.3d 717 (2007).

Moreover, the interpretation and legal effect of written instruments are matters of law over which an appellate court exercises unlimited review. *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 763, 27 P.3d 1 (2001). The insurance policy at issue is a written instrument subject to our interpretation de novo.

### Analysis

As set forth above, the policy at issue states that the defendants have a duty "to investigate, defend, conduct settlement negotiations and enter into settlements for any 'claim' or 'suit' for which coverage is provided by the terms of the policy." It also states that Westport and Employers agree to pay "all expenses incurred in the defense of any 'claim' or 'suit' against the insured alleging any covered 'wrongful act,' and seeking 'loss' on account thereof, even if

the 'claim' or 'suit' is groundless, false, [or] fraudulent." Such language in liability insurance policies makes it "fair to describe [them] as 'litigation insurance,' a kind of coverage that protects insureds against the financial costs associated with being sued." Jerry & Richmond, Understanding Insurance Law, § 111[a] at 826 (4th ed. 2007) (citing *Allstate Ins. Co. v. Campbell*, 334 Md. 381, 392, 639 A.2d 652 [1994] [quoting *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 410-11, 347 A.2d 842 (1975)]; *Auto Ins. Co. of Hartford v. Cook*, 7 N.Y.3d 131, 818 N.Y.S.2d 176, 850 N.E.2d 1152 [2006]).

"As between the duty to pay proceeds and the duty to defend, it is often said that the more expansive, broader duty is the duty to defend. The source of this observation is in the fact that an insurer is contractually obligated to defend even meritless suits that fall within the coverage. Presumably, the plaintiff's claims in meritless suits will be defeated, and the insurer will therefore not incur any obligation to provide indemnification. But before the merits are decided, the insurer must provide and pay for the insured's defense. In effect, the insured receives 'coverage' for the defense itself, even though no duty to indemnify will ever exist in that situation. In other words, the duty to defend is broader in the sense that it is triggered in more situations than the duty to indemnify.

". . . [T]he insurer must defend only actions against insureds that allege claims within the coverage. There is no duty to defend claims outside the coverage, although . . . there are circumstances where insurers end up defending non-covered claims, notwithstanding the absence of a contractual obligation that they do so.

"The foregoing is elucidated if one reflects upon the conditions that apply to the insurer's duties to defend and to indemnify. The duty to indemnify exists as soon as the contract is formed, but the duty is a conditional one: the insurer's duty to pay proceeds is not due and owing until the insured's liability, which basically depends on how the law applies to the facts, is established. The duty to defend is not similarly conditioned: the duty to defend exists as soon as the claim within coverage is made, regardless of whether the law of negligence would impose liability in the circumstances. Because the duty to indemnify is conditioned and the duty to defend is not subject to the same or a similar condition, the duty to defend is triggered in more instances, 'but this does not alter the essential underlying relationship between the insurer's defense obligation and the existence of coverage.' " Jerry & Richmond, § 111[a] at 826-27 (citing, *inter alia*, Jerry, *The Insurer's Right to Reimbursement of Defense Costs*, 42 Ariz. L. Rev. 13, 17-19 [2000]).

This is not a negligence action; it is not an action to establish the existence or absence of the agents' liability to their clients. This is

a straightforward contract dispute, brought by the agents against their insurers. The agents argue they have a colorable claim under their errors and omissions policy and that the insurers breached their contract by failing to investigate or defend on the agents' behalf. When their clients' money was stolen, the agents did everything they were required to do to invoke coverage under their policy for their potential liability. They notified the administrator of their insurers and then made a formal claim for coverage, including the losses sustained by all 12 clients. Because the agents ultimately settled with those clients, liability will never be determined. That question was not at issue in this case, and it and the concepts of foreseeability and proximate cause were inappropriate bases for its disposition. The district court and the Court of Appeals panel erred in ruling on the possibility of *negligence* when faced with dueling summary judgment motions; their actual charge was to determine whether, on the facts established by the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, there was a possibility of *coverage* under the language of the policy.

Under Kansas law, lawsuit pleadings are merely a starting point for the duty to defend analysis. They are "not dispositive. An insurer must additionally consider actual facts of which it is or should be aware when evaluating its duty to defend." Jerry & Richmond, § 111[c][2] at 833. The insurer

" 'must look beyond the effect of the pleadings and must consider any facts brought to its attention or any facts which it could reasonably discover in determining whether it has a duty to defend.' If these known or reasonably discoverable extrinsic facts give rise to potential liability on the insured's part, the insured has a duty to defend. . . . This approach has become known as the 'extrinsic evidence' approach or rule. Under [this] approach, the insurer's duty to defend still hinges on the potential for coverage, but the universe of information from which that potential must be ascertained is much greater [than the universe used in an approach limited to the 'eight corners' of a pleading and the applicable insurance policy]." Jerry & Richmond, § 111[c][2] at 833-34 (quoting *Spivey v. Safeco Ins. Co.*, 254 Kan. 237, 245-46, 865 P.2d 182 [1993]; citing *Steinle v. Knowles*, 265 Kan. 545, 554, 961 P.2d 1228 [1998]).

See *LDF Food Group, Inc. v. Liberty Mut. Fire Ins. Co.*, 36 Kan. App. 2d 853, 859, 146 P.3d 1088 (2006), *rev. denied* 283 Kan. 931 (2007).

In *South Central Kansas Health Ins. Group v. Harden & Co. Ins. Services, Inc.*, 278 Kan. 347, 351-52, 97 P.3d 1031 (2004), this court carefully reviewed its precedent—including *Steinle* and *Spruill Motors Inc. v. Universal Underwriters Ins. Co.*, 212 Kan. 681, 684-88, 512 P.2d 403 (1973)—and stated that the cases "stand for the proposition that insurers have a duty to defend if there is a potential for liability." This initial use of the word "liability" rather than "coverage" has the potential to confuse, but the opinion continues immediately: "They do not stand for the proposition that the duty exists after a finding that there is no coverage under the insurance policy. [Citations omitted.]" *Harden*, 278 Kan. at 352. The remainder of the *Harden* opinion also makes clear that the essential inquiry when determining the existence of a contractual duty to defend involves potential for coverage, not liability. See 278 Kan. at 352-53.

This is consistent with our prior pronouncements. See, *e.g.*, *Spruill*, 212 Kan. at 686 ("duty to defend rests primarily on the possibility that coverage exists"; insurer has duty to defend if, based on pleadings and any reasonably discoverable facts, there is a possibility of coverage, even if remote); see also *Aselco, Inc. v. Hartford Ins. Group*, 28 Kan. App. 2d 839, 848, 21 P.3d 1011, *rev. denied* 272 Kan. 1417 (2001) (the duty to defend rests primarily on the possibility that coverage exists); *cf. Spivey*, 254 Kan. 237, Syl. ¶¶ 4, 5 (no duty to defend where policy specifically excluded coverage).

The coverage language of the policy before us was extremely broad. Its definition of wrongful acts included not only any proved negligent act, error, or omission but any merely alleged. There is no question that the agents' clients suffered a loss. Counsel for the agents supplied the defendant insurers with the Assurance of Voluntary Compliance entered into by the agents and the Kansas Attorney General's office, which recited allegations that T & M owed a fiduciary duty to its clients, that T & M held itself out as having specialized knowledge and skill in financial planning, that it implied it had performed due diligence regarding the viability and legal compliance of Associated, and that it had not, in fact, performed that due diligence. These allegations—breach of a fiduciary duty

of care—were part and parcel of the agents' 12 clients' claims. They sounded in negligence, as well as raising the potential for liability under several statutory schemes. There is no dispute that the allegations in the petition of the two clients who filed a lawsuit also included negligence claims. Thus its absence from the record on appeal is of no moment.

Defendant insurers argue that the clients' allegations against the agents did not arise, as required by the coverage language of the policy, out of the "conduct of the business of the 'insured agent[s]' in rendering services for others as a licensed life, accident and health insurance agent." This may be artful, but it is still a dodge. The Assurance of Voluntary Compliance states that the clients' reimbursement was being made to "resolve a disputed legal liability arising out of [the agents'] rending services for others as a licensed Life, Accident, and Health Insurance Agent, general agent, or broker." Moreover, the policy's Key Point Summary, evidently never disavowed by the defendants, made explicit reference to coverage of the agents' financial planning activities. At a minimum, under our extrinsic evidence approach, this raises an ambiguity to be resolved in favor of the insured agents on the coverage/duty to defend issues. See *Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 281 Kan. 844, 858, 137 P.3d 486 (2006); Jerry & Richmond, § 111[c][3] at 835-36.

We also reject defendants' argument that the facts as known or as reasonably should have been known to them excused their duty to defend the agents because of one or more policy exclusions set forth in Sections VII(B) and VII(T), quoted above. See *Steinle*, 265 Kan. 545 (title insurance loan policy covered insured only in insured's capacity as lender, not in capacity as vendor; insurer had no duty to defend insured in purchaser's suit alleging defect in title conveyed by insured as vendor); *Spivey*, 254 Kan. 237 (policies' intentional act exclusions not ambiguous, specifically excluded coverage for employee's intentional tort claims).

With respect to insurance policies, defendants concede that the insurer bears the burden to prove that a loss or claim is excluded under the policy. See *Shelter Mut. Ins. Co. v. Williams*, 248 Kan. 17, 29-30, 804 P.2d 1374 (1991); see also *Marquis v. State Farm*

*Fire & Cas. Co.*, 265 Kan. 317, 327, 961 P.2d 1213 (1998) ("Generally, exceptions, limitations, and exclusions to insurance policies require narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes the duty to define any limitations on that coverage in clear and explicit terms."); 2 Holmes' Appleman on Insurance, § 6.1 at 173 (2d ed. 1996) ("Most American courts apply a rule of construction that coverage terms are construed broadly and exclusions and limitations of coverage are construed narrowly.").

Section VII(B) of the policy excludes coverage only if the agents committed or contributed to the commission of any "intentional, dishonest, fraudulent, criminal or malicious act." There is no question that Usher committed the dishonest and fraudulent acts. The Assurance of Voluntary Compliance alleged certain deceptive acts by T & M, but these acts were never proved or admitted. Further, given the district court's and the Court of Appeals' rulings that Usher's dishonest and fraudulent conduct was not foreseeable, rulings that defendants do not contest, the record on appeal cannot support a conclusion as a matter of law that the agents' referrals to Associated constituted commission or contribution to commission of Usher's dishonesty or fraud. Defendants' mere suggestion that the agents provided illegal rebates to their clients also does not mean that the exclusion in Section VII(B) is met. Thus that section did not relieve defendants of their duty to defend the agents.

Section VII(T) of the policy excludes coverage for "any 'claim' arising out of or in connection with a fraudulent or nonexistent entity." Defendants argue that Associated qualifies. We disagree. Usher committed dishonest and fraudulent acts and otherwise failed to comply in certain respects with Kansas law, but, on this record, it appears the Associated entity nevertheless existed. It was incorporated for ostensibly lawful purposes. Section VII(T) of the policy also did not relieve defendants of their duty to defend the agents.

Having determined that a duty to defend arose and was not undercut by the policy exclusions advanced on appeal by defendants, it is apparent that the summary judgment in favor of those defendants must be reversed and entered instead for the plaintiff

agents. There was no compliance with the contractual duty to defend, and, as a direct result, the plaintiff agents incurred defense and settlement costs. See Jerry & Richmond, § 111[h] at 851-53 (compensatory, consequential damages recoverable on breach of duty to defend). The amounts are not contested.

This case is therefore reversed and remanded to the district court to vacate its previous order of summary judgment, to enter summary judgment in favor of plaintiffs in the amounts prayed for in their petition, and for such other orders as the district court deems necessary and consistent with the foregoing opinion.

Reversed and remanded with directions to the district court.

ROSEN, J., not participating.

LEBEN, J., assigned.